Filed 3/24/16

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ADAM ARELLANO,<br><br>    Defendant and Appellant. | F068958<br><br>(Kern Super. Ct. No. BF144202A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of "Part I Facts" and part II of the Discussion.

## INTRODUCTION

Appellant/defendant Adam Arellano was charged with count I, first degree premeditated murder of Reynoldo Daniel "Woody" Abrego (Abrego) (Pen. Code, §§ 187, subd. (a), 189),[1] count II, felon in possession of a firearm, based on the murder weapon (§ 29800, subd. (a)(1)), and other felony offenses. After a lengthy trial, the jury was unable to reach a verdict on counts I and II, the murder and possession charges, and the court declared a mistrial as to those counts. The jury convicted defendant of the other charged offenses: count III, possession of an assault weapon, based on a rifle found in the trunk of the car which defendant drove to the scene and left there after the homicide (§ 30605); and count IV, active participation in a criminal street gang (§ 186.22, subd. (a)). He was sentenced to 12 years.

During jury selection, the People used peremptory challenges to excuse all three African-American women from the panel. Defendant objected pursuant to *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), and argued the prosecutor was systematically excluding African-American women from the jury. The court found defendant made prima facie cases of racial discrimination as to all three prospective jurors and asked the prosecutor to state the reasons for the challenges. The prosecutor did so. Thereafter, the court found the prosecutor had stated race-neutral reasons and denied defendant's *Batson/Wheeler* objections.

On appeal, defendant contends the court should have granted his *Batson/Wheeler* motion to discharge the jury because the prosecutor was systematically excluding African-American women from the jury, and his stated reasons were not supported by the record and were not race neutral. Defendant also contends there is insufficient evidence

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

to support his conviction for possession of the assault rifle found in the trunk of the car he drove to the homicide scene.

As we will fully discuss in the published portion of this opinion, "once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767; *People v. Silva* (2001) 25 Cal.4th 345, 384 (*Silva*).) The exclusion by peremptory challenge of a single juror on the basis of race, gender, or ethnicity is an error of constitutional magnitude requiring reversal. (*Silva*, *supra*, 25 Cal.4th at p. 386; *People v. Bonilla* (2007) 41 Cal.4th 313, 340–341 (*Bonilla*).) On review, *Batson/Wheeler* error is reversible per se, and the remedy is a new trial without any inquiry into harmless error. (*Wheeler*, *supra*, 22 Cal.3d at p. 283; *People v. Cisneros* (2015) 234 Cal.App.4th 111, 120; see e.g., *Rivera v. Illinois* (2009) 556 U.S. 148, 161; *Winston v. Boatwright* (7th Cir. 2011) 649 F.3d 618, 628.)

We find the record supports the court's ruling as to the prosecutor's reasons for excusing two of the prospective African-American jurors. However, the prosecutor's stated reason for excusing the third prospective juror is not supported by the record and contrary to the evidence presented at voir dire. As a result, we are compelled to reverse defendant's convictions for count III, possession of an assault weapon, and count IV, active participation in a criminal street gang, because of *Batson/Wheeler* error.[2]

_____

[2] At the sentencing hearing on February 19, 2014, the prosecutor stated his intent to immediately retry defendant for counts I and II. In October 2015, while this appeal was pending, defendant was retried for count I, first degree premeditated murder of Abrego, and count II, felon in possession of a firearm, based on the murder weapon. On October 9, 2015, the jury found him not guilty of both counts. This court has taken judicial notice of the minute order of October 9, 2015, reflecting the jury's not guilty verdicts for counts I and II at the retrial. (Evid. Code, § 459)

# PART I[*]

## FACTS

On the evening of August 29, 2012, Salomon Arreguin (Salomon)[3] invited several friends to his house in Arvin. They stood around in the front yard and drank beer. Among the guests were his cousins, David Cisneros, Jr. (Cisneros) and Raul Arreguin (Raul). Antonio Ramirez (Ramirez), another cousin, lived across the street from Salomon. Ramirez had his own gathering in his front yard at the same time.

Salomon testified that around 1:00 a.m., defendant arrived at Ramirez's house in a black Impala and parked the car on the street.

Around 2:00 a.m., Abrego rode by Salomon's house on his bicycle. Cisneros knew that Abrego had recently been released from prison. Cisneros testified Abrego stopped his bicycle in the middle of the street, and defendant walked up and talked to him. Abrego and defendant went to Ramirez's house together and drank beer. After a while, Cisneros called out to Abrego to join them at Salomon's house. Abrego left Ramirez's house and joined Cisneros, Salomon, and Raul in Salomon's front yard.

Salomon testified to a slightly different version of events. Salomon testified that Abrego rode by on his bicycle, Cisneros called out to him to stop, and Abrego went to Salomon's house. Salomon testified that Abrego then crossed the street to Ramirez's house. Abrego and defendant talked and drank beer together for about 10 minutes. Salomon did not see any problems between them. Salomon testified that Abrego finished his conversation with defendant and returned to Salomon's front yard.

---

[*] See footnote, *ante*, page 1.

[3] Several witnesses in this case have the same last name. We refer to them by their first names for ease of reference; no disrespect is intended.

4

## Arrival of the man in the truck

Salomon testified that sometime between 2:30 a.m. and 2:45 a.m., a grey truck or SUV arrived at Ramirez's house. A man got out and joined Ramirez and defendant in Ramirez's front yard.

Salomon testified he went inside his house around 3:20 a.m. Raul also left and went to his nearby residence. Cisneros and Abrego stayed in Salomon's front yard. Ramirez and defendant were still across the street with the man from the truck.

Cisneros testified to a different version of events about the truck. He testified that it arrived at Ramirez's house after Salomon went inside. A man got out of the truck and joined Ramirez and defendant.

Cisneros gave conflicting statements about whether he knew the man in the truck. He initially testified he did not know him. However, Cisneros also testified that Martin Valadez was the man in truck, and admitted he had never revealed his name before trial. Valadez was in a relationship with defendant's sister, Irene.

## The murder

Cisneros was the prosecution's primary witness about the actual shooting. Cisneros testified the man from the truck crossed the street, walked up to Salomon's front yard, and asked Abrego for a cigarette. Abrego said he did not have a cigarette. Cisneros testified they just stood there looking at each other for 10 to 15 seconds and did not say anything.

Cisneros testified that defendant walked across the street and approached Salomon's front yard. He said defendant pulled a handgun and started shooting Abrego at close range. Cisneros immediately ran away, and heard more gunshots as he ran to his own house on the next street.

Salomon testified he heard two gunshots around 3:30 a.m., about five minutes after he went inside his house. He looked through the kitchen window and saw defendant standing with one foot in the street, and one foot on the sidewalk in front of Salomon's

5

house.  Defendant was "shooting maybe seven, eight more times onto the ground." Salomon could not see who or what defendant was shooting at, but defendant was standing "on top of whatever he was shooting."

**Salomon calls 911**

Salomon testified that immediately after he heard the gunshots and looked out the window, he called his cousin, Marivel, who had been at his party earlier that night. Salomon told Marivel that her cousin, Abrego, had just been shot.  Salomon then called 911.  As he waited for the 911 operator to answer, he walked outside and saw Abrego lying on the ground and realized he was dead.  He also saw someone running away. Cisneros was not there.  Salomon told the 911 operator that the gunman was probably defendant; it sounded like a handgun was used; and defendant was running north on Walnut.  Salomon noticed defendant's black Impala was still parked on the street.

**The fatal wounds**

At 3:28 a.m., officers from the Arvin Police Department responded to Salomon's house and found Abrego lying face down on the street.  Abrego died from multiple gunshots fired into his body.  There were 15 spent nine-millimeter casings around Abrego's body.  They were all the same brand and had been fired from the same nine-millimeter semiautomatic weapon.  The murder weapon was never found.

**The investigation**

Officer Gonzalez spoke to Salomon at the scene.  Salomon said he heard two gunshots, looked out the kitchen window, and saw defendant firing.

Officer Gonzalez also spoke to Cisneros at the scene.[4]  Cisneros was shaking, crying, and afraid.  Cisneros repeatedly said defendant had just shot and killed Abrego.

---

[4] Cisneros testified he was hiding at his house until he heard the police sirens. About 20 minutes after the shooting, he walked back to Salomon's house to see what happened.  The police were already there, and he saw Abrego's body on the ground. Salomon testified Cisneros returned to his house before the police arrived.  Salomon's mother testified Cisneros showed up after the police were there.

6

Cisneros said a Hispanic male had walked up to them and asked for a cigarette. Cisneros said defendant walked across the street and shot Abrego, and kept firing into Abrego's body on the ground.[5] Cisneros said the first man distracted Abrego before defendant shot him. Cisneros did not want to talk to the police at the scene; he was afraid someone would hurt or shoot him.

Officer Gonzalez also interviewed Ramirez at the scene. Ramirez gave inconsistent statements about what happened. Ramirez alternately said he was not home; he was inside the house; and/or he was outside cleaning trash when the shooting occurred and he did not see what happened. Ramirez said four people were at his house that night, including defendant and his brother, Steven Arellano (Steven). Ramirez said that Steven picked up defendant before the shooting.

**Discovery of the assault rifle**

When the police arrived at the scene and found Abrego's body, they also found a black Chevrolet Impala parked in front of Ramirez's house. The witnesses said defendant had driven the car to the scene just before the shooting and, after the shooting, he ran away and left the car there. The police never located the keys.

The Impala was registered to Steven and contained paperwork in Steven's name. The fingerprints of both defendant and Steven were found on the car.

An auto loader for a revolver was inside the car's center console; it contained six unspent .38-caliber cartridges. A .45-caliber cartridge case was in the glove box. An empty gun box for a .45-caliber Glock was in the back seat; the box contained a gun lock and a cartridge case. The Glock was not in the car.

---

[5] Cisneros testified he was crying and scared when he talked to the police at the scene. Cisneros admitted he said that defendant shot Abrego. He knew other people at the scene saw him talk to the police.

A Russian-made SKS semiautomatic rifle was found in the trunk. It had one live 7.62 x .39-millimeter round in the chamber, and 29 identical rounds were in the attached 30-round capacity magazine. A bayonet was attached to the rifle.[6]

**Further investigation**

On September 21, 2012, officers conducted a traffic stop on a vehicle being driven by Steven. Several photographs were found in the car, one of which showed defendant, Steven, Martin Valadez, David Martinez, and another person, and they were "all holding up an SKS assault rifle."

A cell phone was recovered from Steven's pocket, and it contained text messages between Steven and David Martinez, dated September 19, 2012 (after Abrego's murder). The messages discussed killing Ramirez, and had words like "we'll whack that fool." They believed he gave information, and they talked about cutting off his tongue.

**SWAT standoff and arrest of defendant**

Later on September 21, 2012, a team of law enforcement officers attempted to execute a search warrant at a house where Martin Valadez lived with Irene and her children. In response to the officers' orders, Valadez, Irene, the children, and another family voluntarily walked out. One of the occupants reported defendant was inside.

A SWAT team ordered defendant to walk out of the house. Defendant did not respond. After maintaining a perimeter for several hours, the SWAT team fired tear gas into the house and defendant surrendered.

**Search of the house**

After defendant was arrested, the officers found several items in a bedroom. A wallet which contained defendant's identification was on top of a table. Under the table, the officers found one loose live round of 7.62 x .39-millimeter ammunition. There was a plastic bag in the same area which contained four boxes of 7.62 x .39-millimeter

---

[6] Defendant was charged and convicted of count III, possession of an assault rifle, based on the presence of this weapon in the trunk of the car he drove to the scene.

8

ammunition and a speed loader for the same type of ammunition. The bag also contained an eight-round magazine for a .45-caliber handgun, several pairs of latex gloves, and a smaller bag that had more loose rounds of various calibers.

The 7.62 x .39-millimeter ammunition was identical and had the same head stamps as the ammunition found in the loaded Russian semiautomatic rifle, recovered from the trunk of the black Impala.

## The Arvina 13 gang

The prosecution's gang expert testified that defendant (known as "Lil Looney"), Steven, Valadez, and David Martinez were members of the Arvina 13 criminal street gang. Ramirez, Cisneros, and Salomon were associated with the gang but were not considered members.

Abrego, the victim, was a high ranking member of Arvina 13. Abrego had prior convictions for robbery, attempted possession of a firearm, and annoying or molesting a child, and had been to prison twice. He had been released from prison a few weeks before he was murdered. The expert testified permission from the gang would be needed if one gang member shot another gang member.

## Additional trial evidence

At trial, both Salomon and Cisneros testified that defendant, not Steven, was the gunman who murdered Abrego. Cisneros was extensively cross-examined and impeached with his multiple inconsistent statements about the murder, including his recantation of his initial statement that defendant was the gunman.

Ramirez testified he had friends over his house that night but claimed not to remember who was there. Ramirez testified defendant arrived at his house in a black car. Ramirez gave inconsistent statements about who was at his house and whether he saw anything. Ramirez ultimately testified Steven separately arrived in a car, defendant left his house in Steven's car, and defendant left his black car at Ramirez's house. Ramirez

9

did not recall telling the police that defendant and Steven were at his house during the shooting.

**Procedural history**

After a lengthy jury trial, defendant was convicted of count III, possession of the assault weapon found in the trunk of the black car, and count IV, active participation in a criminal street gang. The jury was unable to reach verdicts on count I, the murder of Abrego, and count II, felon in possession of a firearm (based on the murder weapon), and the court declared a mistrial on those charges.

On February 19, 2014, defendant was sentenced to 12 years in prison. The prosecutor stated his intent to immediately retry defendant for counts I and II.

In October 2015, while the instant case was pending on appeal, defendant was retried for count I, first degree premeditated murder of Abrego, and count II, felon in possession of a firearm. On October 9, 2015, the jury found him not guilty of both counts.[7]

**PART II**

**JURY SELECTION**

In this case, the court conducted lengthy voir dire proceedings on November 18, 19, 20, 21, and 22, 2013. As we will explain, defendant made two separate *Batson/Wheeler* motions after the prosecution used peremptory challenges to remove three prospective jurors who were African-American women: V.B., V.K., and W.W.

---

[7] Aside from the minute order reflecting the not guilty verdicts, the record of defendant's second trial is not part of the instant appellate record. According to the minute order, the jury began deliberating on the murder and felon in possession charges on the morning of October 9, 2015. At 10:45 a.m., the jury asked to hear two items of evidence: Salomon's 911 call and Cisneros's testimony. The court reporter started to read back Cisneros's testimony after lunch at 1:30 p.m. At 2:30 p.m., the jurors stopped the court reporter in the midst of hearing Cisneros's testimony, and said they didn't need to hear anymore. At 3:00 p.m., the jury returned the not guilty verdicts.

In response to defendant's objections, the court found prima facie cases were established and asked the prosecutor to explain the reasons for excusing each person. After hearing the prosecutor's explanations, the court denied defendant's *Batson/Wheeler* motions.

We turn to the chronological history of voir dire as relevant to these three prospective jurors. As we will explain, the court properly denied defendant's *Batson/Wheeler* motions as to prospective jurors, V.B. and V.K., but it should have granted defendant's motion in response to the prosecutor's use of a peremptory challenge to excuse prospective juror, W.W.

**Hardship stage—Prospective Juror V.B.**

On the first day of jury selection, the court began with 75 prospective jurors and asked for hardship excuses for the approximately two- to three-week trial. (RT 2-5)

W.W. was in the first group of prospective jurors, and she did not request a hardship excuse.

After the court granted numerous hardship excuses, it called in another large group of prospective jurors. The second group included V.B. and V.K., both of whom requested hardship excuses.

Prospective Juror V.B. requested a hardship medical excuse because she was diabetic, she had to regularly eat, and she had to frequently use the restroom. She also said her "kids were accused of being in gangs" in Kern County. Her son had been convicted of felony robbery, and another son was involved with a cousin who was a gang member. In response to the court's question, Prospective Juror V.B. stated that her family situation and health concerns would prevent her from giving her undivided attention to the case.

The prosecutor stipulated to Prospective Juror V.B.'s hardship excuse.

11

Defense counsel declined to stipulate and asked Prospective Juror V.B. whether she could sit through the trial and use the restroom during breaks. She said yes, and explained she drove a bus, and she stopped and used the restroom when she needed it.

Defense counsel asked why her son's situation would affect her ability to give defendant a fair trial. Prospective Juror V.B. replied:

"I didn't say that would affect me. I said similar, because they asked did you have a similar situation, and I said it's not quite, but it's kind of similar as far as the gang-related part."

Defense counsel advised Prospective Juror V.B. that they were trying to find impartial jurors, and asked whether her son's situation would affect how she would listen to the facts of the case. She replied:

"I can't say it won't, you know what I mean, because I don't know what the situation is, so I can't really answer that. You know what I mean? So I really can't answer that, if it would affect me or not, because I haven't heard anything and I don't know if his situation might come into play with his, but in a similar situation. That question I couldn't answer honestly."

Defense counsel asked Prospective Juror V.B. if she would be biased upon learning the case involved something similar to her son's situation. She replied: "I couldn't answer that," and "I don't know what I would do." Defense counsel asked if she presumed defendant guilty. She replied that he could not be guilty because "[d]on't nobody know anything, so how can you say he's guilty." She presumed defendant was innocent, and understood the People had the burden to prove the case beyond a reasonable doubt.

After asking these questions, defense counsel declined to stipulate to Prospective Juror V.B.'s hardship excuse.

The prosecutor asked Prospective Juror V.B. if either of her sons were sent to prison. She said both went to prison. The prosecutor asked if she felt the system treated them fairly. She said no because "before my son went up, one person went up. They were both similar. That one got off with probation. The other one got sent to jail. And

12

I'm like what the heck?" She said it was the same case but "different D.A.s. One gets probation; one goes to jail." She also said it was "racial" because her son was black and the other suspect was white. "But they pretty much did the same thing. That one got slapped on the wrist and my son went to jail …." She believed it was unfair.

The prosecutor asked Prospective Juror V.B. if she had "a chip on your shoulder towards the District Attorney's Office?" She said no, that it was "all dead and done with. That's all in the past," and it happened 10 or 15 years ago. The prosecutor asked her if she was afraid of gangs, and she said no. He asked if her sons talked to her about gangs. She replied, "No. They tried to tell me a little about it, but I'm like you can't wear this, you can't do this, you know. It don't bother me. I wear what I wanna wear and say what I wanna say." She did not have any problem saying defendant was guilty of murder if she thought the evidence showed that.

Prospective Juror V.B. remained on the panel through the hardship stage.

**Hardship stage—Prospective Juror V.K.**

On the second day of jury selection, Prospective Juror V.K. requested a hardship financial excuse because she was a special needs social worker for Kern Regional Center, and her employer only paid for 15 days of leave. The court asked the attorneys whether the case could be resolved in 15 court days. Defense counsel said it would be really close, and the trial would probably take 20 to 25 calendar days because of upcoming holidays in November and December.

The court asked Prospective Juror V.K. if there were any other reasons. She said she had a medical test in two weeks and asked about the court's schedule. The court explained the trial and holiday calendars. She said she could schedule the test around those dates.

Prospective Juror V.K. was not given a hardship excuse and remained on the panel.

13

**The court's voir dire—Prospective Juror W.W.**

On November 21, 2013, the court completed the hardship stage and seated 12 people in the jury box for further voir dire and challenges. Prospective Jurors W.W. and V.K. were in this group, and responded to various questions.

The court began voir dire with Prospective Juror W.W.[8]

> "Q. [Y]our occupation.
>
> "A. I'm a field representative for the Department of Commerce.
>
> "Q. All right. What do you do in that important capacity?
>
> "A. *I collect information for Congress and President and different organizations that distribute information back down to the cities and counties about work, the state of the nation, how people are doing health-wise—*
>
> "Q. How are you doing on Obama Care? [¶] That's a two-way street, isn't it, for you? Pretty busy right—or do you handle that?
>
> "A. I don't." (Italics added.)

The court asked Prospective Juror W.W. about her education and vocational background. She said she had two accounting degrees, and she had worked for the Department of Commerce in Kern County for 22 years in the same capacity. Her spouse worked for the City of Bakersfield; he was not in law enforcement, but she did not specify his job.

Prospective Juror W.W. said she had served on four prior juries.

> "Q. … What were those cases all about?
>
> "A. One was a police situation in Shafter. There was a fight between some people at a school and police were fighting, and this person saw the fight and he came over to get into it and he charged—filed charges for police brutality.

---

[8] We quote the court's entire exchange with Prospective Juror W.W. because during the *Batson*/*Wheeler* hearing, the prosecutor said he used a peremptory challenge to excuse her since she worked for a "liberal political organization."

14

"Q. Okay. So it was, I take it—unless it was an interference with one's Civil Rights.

"A. Yes.

"Q. It would have been a suit for, what, money damages, police brutality?

"A. Police brutality. It wasn't money."

Prospective Juror W.W. believed it was a civil suit for reimbursement for medical care and not money damages, and the jury reached a verdict in that case. She also sat on a theft case that was prosecuted by the district attorney's office, but it settled. Another case was a misdemeanor suit for damages where there was an accident after a stop sign had been moved because of roadwork, and a verdict was reached. She could not remember the fourth trial because it was a long time ago but knew the case settled out of court.

The court explained the different burdens of proof between civil and criminal trials, and Prospective Juror W.W. said she understood and did not have any problems with it.

Prospective Juror W.W. did not know defendant or any of the witnesses and did not have any problem giving both sides a fair trial in this case. She had not been affected by any gang-related violence.

The court asked Prospective Juror W.W. if she ever had a less than pleasurable experience with law enforcement, and she said yes. She said she was attacked on the corner of Chester and Truxton, near the courthouse, when she was working at the assessor's office. A woman attacked her and claimed "I was messing with her husband, but I was not." The woman's husband "was telling her a bunch a lies. He was trying to talk to me and I wouldn't talk to him." Prospective Juror W.W. said she was walking to the bus stop, and the woman drove up and attacked her. A bystander broke up the incident, and someone called the police. "[T]hey came over and I asked them to give me

15

a ride home and they took off." Prospective Juror W.W. was injured a "little bit." The police did not offer to get her any medical care.

"Q.     Would that affect your ability to be fair and impartial in this type of case?

"A.     No."

The court clarified the Bakersfield Police Department was not involved in this case, and asked if she had any experiences with the Arvin Police Department. She said no.

The court asked whether Prospective Juror W.W., her family, or close friends had been victims of a crime, or charged with committing a crime. She said no. She did not know anyone in the offices of the district attorney or public defender. She did not know about any pretrial publicity, and could not think of a reason that she could not be impartial.

**The court's voir dire—Prospective Juror V.K.**

In response to the court's questions, Prospective Juror V.K. said she was a special needs social worker at Kern Regional Center. Her husband was a "[s]enior pastor." She did not further define his position or where he was a pastor.

Prospective Juror V.K. said she did not have any religious or philosophical beliefs that would prevent her from serving as a juror. She did not have any problem with judging the facts and evidence to determine if the accused committed a crime. She had never served on a jury before.

Prospective Juror V.K. said she did not have any close friends or relatives in law enforcement, and she did not know the defendant, the attorneys, or the potential witnesses. There was nothing about the nature of the case that would affect her ability to be impartial. She never had a less-than-pleasurable experience with law enforcement, she had never been a crime victim, and she did not have any friends or family who had been

16

charged or convicted of a crime. She did not know about any pretrial publicity and did not know of any reason why she could not give both sides a fair trial.

**Further voir dire—Prospective Jurors W.W. and V.K.**

After the prosecutor passed the panel for cause, defense counsel asked several jurors how they felt about sitting on a case involving gang violence, and whether they could presume defendant was innocent.

Defense counsel asked Prospective Juror W.W. about sitting on a gang case. She replied:

> "I've never had any contact with any gangs. I don't know anything about them. I've heard about that there were gangs in different parts of the country, but I don't have a problem feeling that someone is innocent before proven guilty. You have to show me what the reason is that they were guilty."

Defense counsel asked Prospective Juror W.W. if the prosecutor's burden was lessened if she learned defendant was tied to a gang. She said no. Defense counsel asked how she felt if defendant had prior felony convictions. She said, "But that's something else. It's not pertaining to this case."

Defense counsel also asked Prospective Juror V.K. about sitting on a gang-related case. She replied:

> "I feel the same, innocent until proven guilty. Just because you're a felon doesn't mean you're a murderer until you're proven to be a murderer. [¶] And gangs are real. It's where we live. It's at our front door. It exists."

Defense counsel asked Prospective Juror V.K. if there was anything about defendant that made her already judge him as guilty. She replied:

> "No. I don't know him. He just looks like a young man, well-groomed, in a nice suit."

Defense counsel advised Prospective Juror V.K. that she would probably see photographs of defendant which showed him throwing up gang signs and asked whether that would change her opinion. She replied, "Innocent until proven guilty."

17

**Peremptory challenges/excuse of Prospective Juror V.K.**

After defense counsel passed the jury for cause, the court asked the prosecutor for his first peremptory challenge. The prosecutor excused Prospective Juror V.K. Defendant did not object.

The clerk called another prospective juror into the box and questioning continued.

Defense counsel made his first peremptory challenge on a prospective juror. The clerk called another prospective juror into the box, and questioning resumed. The prosecutor made his next peremptory challenge. The clerk then called Prospective Juror V.B. into the box.

**Voir dire with Prospective Juror V.B.**

In response to the court's questions, Prospective Juror V.B. said she was a bus driver, and she was fully compensated for jury duty.[9] Her spouse was a foreman with a company that trimmed trees for PG&E. She had never served on a jury. She did not have any relatives or close friends in law enforcement. She did not know defendant or any of the witnesses. There was nothing about the case which would prevent her from being impartial. She never had any bad experiences with law enforcement. She had never been charged with a crime. She did not know anyone in the offices of the public defender or district attorney. She did not know about any pretrial publicity, and she could give both sides a fair trial.

The court asked Prospective Juror V.B. if she had heard all the questions already asked of the other prospective jurors. She said she tried to hear some of them. The court asked if those questions raised any issues she wanted to discuss with the court. She said no.

---

[9] Prospective Juror V.B. had already answered questions during the hardship stage and said that she had two sons who had served time in prison.

**Defendant's first _Batson_/_Wheeler_ objection—Prospective Jurors V.K. and V.B.**

Both sides passed the panel for cause. Defense counsel excused another prospective juror, and the process continued. The prosecutor and defense counsel each used another peremptory challenge.

The prosecutor used his next peremptory challenge to excuse Prospective Juror V.B. Defense counsel immediately advised the court that he wanted to make an objection. The court excused the prospective jurors from the courtroom.

Defense counsel made a _Batson_/_Wheeler_ motion based on the prosecutor's use of peremptory challenges to excuse Prospective Juror V.K. first, and then excuse Prospective Juror V.B., who were both African-American.

The court thought Prospective Juror V.K. had a timing problem with the trial. Defense counsel said they agreed the trial would be completed in 15 court days.

Defense counsel did not see any reason to excuse Prospective Juror V.K. except for being an African-American female. Defense counsel conceded there might be reasons to excuse Prospective Juror V.B. based on her past, "but when you put her in combination with [V.K.], which there was nothing whatsoever as to [V.K.] showing a bias one way, that that's the reason why I'm doing this motion. Just because there's been two people excused in between [V.B. and V.K.], one being obviously one working for a defense attorney, doesn't mean that he's not systematically trying to get rid of an entire race."

### _Prima facie case_

The court stated that it had to first determine if there was a prima facie showing of group bias. The court stated there were three African-Americans still in the box (prospective jurors eight, nine, and two (W.W.). As to Prospective Juror W.W., the court was "pretty sure" she was African-American. Defense counsel concurred that she was African-American.

19

The court did not see anything in Prospective Juror V.K.'s presence, demeanor, or situation to support a peremptory challenge and found a prima facie case and possible discriminatory purpose as to her.

### *The court's request for justification*

The court asked the prosecutor to respond and explain if there were permissible, race-neutral justifications to excuse Prospective Jurors V.B. and V.K. The prosecutor replied:

> "The Court having found a prima facie case as to [*V.K.*], *her spouse is a senior pastor, and I'm always concerned with people from the clergy coming in because they have a lot of dealings and sympathy and that type of outreach.*

> "And when [defense counsel] was questioning her and he was asking about what she thinks, she said he looks—*she said the defendant looks like a young man, groomed, in a nice suit, accurate observations, but it was the way she said it, and coming with the fact that her husband's a senior pastor, which to me means the head of a church, causes me great concern that she will increase my burden of proof and hold me to a higher standard of feel sympathy for the defendant.* Even if she thinks she can do it—even if she thinks she can be fair, based on her answers, I don't think she can be." (Italics added.)

As for Prospective Juror V.B., the prosecutor stated it was "a little bit more obvious" because she had health issues, and she said her children "were accused of being in gangs and were convicted of crimes. One was like a robbery. And then she said she can't decide whether her son's situation will affect her or not were her words. [¶] And she said her sons weren't treated fair. She did say it was more than ten years ago, but still with those remarks I found—she was an obvious kick for me."

While Prospective Juror W.W. was still on the jury panel, the prosecutor interjected that he was "not willing to concede" that she was African-American. The prosecutor added, "Possibly, but I can't tell based on—because she is very light-complected." The court said it initially believed she was Hispanic but concluded she was African-American. The prosecutor said he did not know.

20

### *The court's denial of the motion*

After hearing the prosecutor's reasons, the court denied defense counsel's

*Batson*/*Wheeler* motion based on Prospective Jurors V.K. and V.B.:

"I feel that the excusing of [V.B.] was for a race-neutral justification. As
you've indicated, her health issue, and then also the children charged with
crimes or associated with those charged with crimes, that there was—that
the strike was race-neutral.

"And then for [V.K.], based upon the senior pastoral duties of her
spouse and her answers to your questions establish that there was a race-
neutral justification for striking her and challenging her."

The court and the parties continued with the selection process.

## Defendant's second *Batson*/*Wheeler* motion

On November 22, 2013, the parties continued with the final day of voir dire and

peremptory challenges. The prosecutor excused another prospective juror. After further

questioning, defense counsel replied that he would accept the jury as it was constituted.

The court asked the prosecutor for his next challenge. He excused Prospective

Juror W.W. Defense counsel immediately made another *Batson*/*Wheeler* objection. The

court excused the panel and asked the reporter to read back Prospective Juror W.W.'s

voir dire responses to clarify its notes.

Defense counsel argued that the prosecutor had dismissed all three African-

American women who had been called to the box as potential jurors. The court replied

that two African-American men were still in seats eight and nine. Defense counsel

argued:

"It seems like [the prosecutor] is systematically throwing off African-
Americans. I don't really see much of a reason. [¶] I do say as to [V.B.], I
think there was enough to which he could have thrown her off and I can see
why he did so. [¶] I did not see for [V.K.]. Even though he gave some
excuse as to the husband being a senior pastor, I think it was just an excuse.
[¶] As to [W.W.], I definitely don't see anything whatsoever as to
[W.W.]."

21

The court asked defense counsel about Prospective Juror W.W.'s statements regarding the incident when she was attacked on the street, and law enforcement did not give her attention or refer her to medical care. Defense counsel replied the prosecutor failed to ask any follow-up questions about whether that incident "had any draining effect on her whatsoever," and she told the court that she could be fair and impartial. "There's nothing about her mannerisms or the way she spoke that led to believe that she was going to hold any type of bias in this case whatsoever."

The court asked the prosecutor whether he had anything to say before it decided whether a prima facie case had been made. The prosecutor again refused to concede that Prospective Juror W.W. was African-American. Defense counsel replied that the prosecutor was being "disingenuous to the Court" to say that she was not African-American. The court again said it appeared she was African-American.

### Prima facie case & request for justification

The court stated that since Prospective Juror W.W. was the third African-American female excused, there was an inference "though very slight, of discriminatory purpose," and asked the prosecutor "to offer permissible race-neutral justifications for the strike." (RT 499) The following exchange occurred:

> "[THE PROSECUTOR]: … Having found a prima facie case, [W.W.] is a –*she works for a liberal political organization where she provides information to the Democratic Party or Congress*—
>
> "THE COURT: *Did you hear 'commerce' and 'Congress' at different times?*
>
> "[THE PROSECUTOR]: I just heard 'Congress.'
>
> "[DEFENSE COUNSEL]: I only heard that of 'commerce.'
>
> "THE COURT: Did you hear 'commerce' too?
>
> "[DEFENSE COUNSEL]: I heard 'commerce.' I never heard—

22

"THE COURT:      Several times.  [¶]  And I think the second thing [the reporter] had read did say 'Congress,' and I thought I heard her say 'Congress' too, but then she goes back to 'commerce.'  [¶]  Didn't mean to interrupt you.

"[THE PROSECUTOR]:    *But she deals with these liberal organizations for what I heard was Congress and collects—she did say she collects information for the government and I don't know—I mean, she could have political motives or anything like that.  I just don't know.  And I don't have all day to go into that.*

"*Then second, she did have a problem with the police.  She didn't like the way things were handled.  And you think about what she wasn't happy with, she was unhappy that they didn't give her a ride home.  Police aren't required to give her a ride home.  So she's kind of holding them to a higher standard than they have.*

"And before that, when talking about her jury service, the first case she mentions is the police brutality suit.  So I think even if she doesn't know it, she's got a little bit of a bias there.  When talking about her prior jury service, the first thing that comes to mind is a police brutality case and then later on she talks about a problem with police.

"So I think she's got a bias against police and potentially some sort of political motives.  Those are my justifications, your Honor."  (Italics added.)

### *The court's denial of motion*

The court denied defendant's second *Batson/Wheeler* motion.

"Based on the totality of the facts surrounding [W.W.'s] interrogation, her answers, I find that you have offered and provided a race-neutral explanation.  Defense has not proved any purposeful racial discrimination."

Thereafter, voir dire continued.  Defense counsel used two more challenges, and the prosecutor also used two more peremptory challenges.  The prosecutor and defense counsel each challenged a prospective alternate juror.

The record strongly implies the final composition of the jury included two African-American men (juror Nos. 8 and 9).

23

**I.      Denial of Defendant's _Batson_/_Wheeler_ Motions**

Defendant contends the court committed reversible error when it denied two _Batson_/_Wheeler_ motions to discharge the jury panel based on the prosecutor's alleged discriminatory use of peremptory challenges.  Defendant, who is Hispanic, contends the prosecution violated his federal and state constitutional rights to equal protection and a jury drawn from a representative cross-section of the community by exercising peremptory challenges to excuse all three African-American women from the jury: Prospective Jurors V.B., V.K., and W.W.

We have already set out the entirety of voir dire as it relates to these three prospective jurors.  We now turn to the legal framework for _Batson_/_Wheeler_ motions, and review the prosecutor's justifications and the court's denial of defendant's motions.

**A.  _Batson_/_Wheeler_**

"Both the state and federal Constitutions prohibit the use of peremptory challenges to exclude prospective jurors based on race or gender.  [Citations.]  Such a use of peremptories by the prosecution 'violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.  [Citations.]  Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution.' " (_Bonilla, supra,_ 41 Cal.4th at p. 341; _People v. Williams_ (2013) 56 Cal.4th 630, 705.)

"There is a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." (_Bonilla_, _supra_, 41 Cal.4th at p. 341.)

"The now familiar _Batson/Wheeler_ inquiry consists of three distinct steps.  First, the opponent of the strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of

peremptory challenges. Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications. Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 383 (*Scott*).) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612−613 (*Lenix*).)

As noted above, the exclusion by peremptory challenge of a single juror on the basis of race, gender, or ethnicity is an error of constitutional magnitude requiring reversal. (*Silva*, *supra*, 25 Cal.4th at p. 386; *Bonilla*, *supra*, 41 Cal.4th at pp. 340−341.) The California Supreme Court has held that African-American women are a cognizable group under *Wheeler*. (*People v. Clair* (1992) 2 Cal.4th 629, 652; *People v. Cleveland* (2004) 32 Cal.4th 704, 734.)

In this case, the trial court found prima facie cases in response to both of defendant's *Batson*/*Wheeler* objections. The court requested the prosecutor's reasons for the peremptory challenges and ruled on the ultimate question of intentional discrimination. Thus, the question of whether defendant established a prima facie case is moot. (*Lenix*, *supra*, 44 Cal.4th at p. 613, fn. 8.)

The burden shifted to the prosecutor to "explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications," and for the court to determine if the prosecutor offered a nondiscriminatory reason and whether "the opponent of the strike has proved the ultimate question of purposeful discrimination." (*Scott*, *supra*, 61 Cal.4th at p. 383.)

## B. The Prosecutor's Reasons

We are thus concerned with the third step of a *Batson*/*Wheeler* analysis. (*People v. Johnson* (2015) 61 Cal.4th 734, 754−755.) "A prosecutor asked to explain his conduct

25

must provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.] 'The justification need not support a challenge for *cause,* and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.] Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*Lenix*, *supra*, 44 Cal.4th at p. 613, italics in original.)

The basis for a peremptory challenge "may range from 'the virtually certain to the highly speculative' [citation] …." (*People v. Chism* (2014) 58 Cal.4th 1266, 1316.) The challenge may be justified by " 'a neutral explanation related to the particular case to be tried' " or " 'maybe based on employment [citation]' " so long as the reasons are not based on impermissible group bias. (*Ibid*.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her." (*Lenix*, *supra*, 44 Cal.4th at p. 613.)

"Review of a trial court's denial of a *Wheeler*/*Batson* is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] We presume that

a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at pp. 613–614.)

"The United States Supreme Court has also emphasized that a state trial court's finding of no discriminatory intent is a factual determination accorded great deference. [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 614.) However, "that review remains a meaningful one. As the high court described it, ' "[d]eference does not by definition preclude relief." ' [Citation.] When reasons are given for the exercise of challenges, an advocate must 'stand or fall on the plausibility of the reasons he gives.' [Citation.] The plausibility of those reasons will be reviewed, but not reweighed, in light of the entire record. [Citation.]" (*Id.* at p. 621, citing *Miller-El v. Dretke* (2005) 545 U.S. 231, 240, 252 (*Miller-El*).)

"Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror." (*Silva*, *supra*, 25 Cal.4th at p. 385–386.) A trial court is not required "to make explicit and detailed findings for the record in every instance in which the court determines to credit a prosecutor's *demeanor-based reasons* for exercising a peremptory challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 929 (*Reynoso*), italics added; *People v. Williams*, *supra*, 56 Cal.4th at p. 653.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are *either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient*." (*Silva*, *supra*, 25 Cal.4th at p. 386, italics added; *People v. Williams*, *supra*, at p. 653.)

27

Thus, " 'the critical question in determining whether a [defendant] has proved purposeful discrimination' in connection with a third-stage inquiry 'is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' [Citation.]" (*People v. Johnson*, *supra*, 61 Cal.4th at p. 755.)  The focus of the third stage inquiry " ' "is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective *reasonableness* of those reasons." ' " (*People v. Trinh* (2014) 59 Cal.4th 216, 241.)

## C. **Analysis**

We begin with several of defendant's general contentions before we review the three prospective jurors who were excused.  Defendant contends the prosecutor's discriminatory intent and an inference of impermissible bias are inherent simply from his use of a disproportionate number of peremptory challenges against a single racial group. The prosecutor used three of eight peremptory challenges to excuse all the African-American women.  However, race-based discrimination is difficult to show from a small number of challenges.  *In People v. Taylor* (2010) 48 Cal.4th 574, the court rejected a similar argument where the prosecutor used three of 10 challenges to excuse one Hispanic and two African-Americans.  *Taylor* held that "[s]uch evidence, without more" was insufficient to create an inference of discrimination, especially where "the number of peremptory challenges at issue is so small."  (*Id*. at p. 643.)

Defendant also complains that the court failed to satisfy its duty under *Batson*/*Wheeler* because it merely accepted the prosecutor's stated justifications, stated conclusions, and did not give detailed reasons for denying the *Batson*/*Wheeler* objections. In evaluating the prosecutor's explanation, however, "the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." (*Reynoso, supra,* 31 Cal.4th at p. 919.)  Only when the

28

prosecutor's stated reasons are unsupported by the record, inherently implausible, or both must the court do more than make a "global finding that the reasons appear sufficient." (*Silva*, *supra*, 25 Cal.4th at p. 386.) As we will explain below, the court's findings were sufficient as to Prospective Jurors V.B. and V.K., but we are concerned about the court's reaction to – or failure to explore – the prosecutor's reasons for excusing Prospective Juror W.W.

Defendant also asserts the prosecutor's use of peremptory challenges must be subject to comparative juror analysis. "[E]vidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal *if relied upon by defendant* and the record is adequate to permit the urged comparisons." (*Lenix*, *supra*, 44 Cal.4th at p. 622, italics added.) "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Ibid*.) "The rationale for comparative juror analysis is that a side-by-side comparison [of the characteristics and voir dire responses] of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 109.)

"Although we must consider comparative juror analysis evidence raised for the first time on appeal [citation], our focus is limited to the responses of stricken panelists and seated jurors *that have been identified by defendant in his claim of disparate treatment*." (*People v. Lomax* (2010) 49 Cal.4th 530, 572, italics added.) Defendant has raised this issue summarily without citing, addressing, or identifying responses from any other prospective or seated jurors as being comparable to the three people who were the subject of his *Batson*/*Wheeler* objections. (See, e.g., *People v. Johnson*, *supra*, 61 Cal.4th at pp. 759–760; *Lenix*, *supra*, 44 Cal.4th at p. 630; *People v. Chism*, *supra*, 58 Cal.4th at p. 1318; *People v. Riccardi* (2012) 54 Cal.4th 758, 787–788.) We take defendant's failure to do so as a concession that he does not depend on a thorough

comparative analysis in support of his argument. Moreover, as we will explain, we need not rely on circumstantial evidence to divine the prosecutor's reasons for excusing the three prospective jurors, particularly any pretextual nature of his reasons for excusing W.W., given his express statements at the *Batson/Wheeler* hearings.

We now turn to the prosecutor's justifications for removing the three African-American women from the panel.

### D. <u>Prospective Juror V.B.</u>

While defendant focuses his appellate arguments on the prosecutor's use of peremptory challenges to excuse Prospective Jurors V.K. and W.W., he also cites to the removal of Prospective Juror V.B. as indicative of the prosecutor's intent to removal all African-American women from the jury. We thus begin with Prospective Juror V.B.

When the prosecutor excused Prospective V.B., defense counsel did not object. As peremptory challenges continued, the prosecutor excused Prospective Juror V.K., and defendant then raised a *Batson/Wheeler* objection as to both Prospective Jurors V.B. and V.K. The court found a prima facie case and asked the prosecutor for explanations.

As to Prospective Juror V.B., the prosecutor cited her health issues, which she had relied on to ask to be excused for cause. The prosecutor also cited Prospective Juror V.B.'s statements about her children – that they "were accused of being in gangs and were convicted of crimes. One was like a robbery. And then she said she can't decide whether her son's situation will affect her or not were her words. [¶] And she said her sons weren't treated fair. She did say it was more than ten years ago, but still with those remarks I found—she was an obvious kick for me." The court found the prosecutor stated a race-neutral justification to excuse Prospective Juror V.B. based on "her health issue, and then also the children charged with crimes or associated with those charged with crimes."

There is substantial evidence to support the prosecutor's race-neutral justifications and the court's findings as to Prospective Juror V.B. As recounted above, Prospective

30

Juror V.B. asked to be excused for cause because of her health concerns and her sons' alleged involvement with gangs in Kern County. She stated both sons had been sentenced to prison, and she felt one son had been treated unfairly by the district attorney's office.

The use of peremptory challenges to exclude potential jurors who have had negative experiences with the criminal justice system, or have relatives and/or family members in prison, is not unconstitutional. (*People v. Roldan* (2005) 35 Cal.4th 646, 703, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Morris* (2003) 107 Cal.App.4th 402, 409.) "[T]he arrest or conviction of a juror's relative provides a legitimate, group-neutral basis for excluding a juror." (*People v. Turner* (2001) 90 Cal.App.4th 413, 419.) Indeed, defense counsel conceded during the *Batson*/*Wheeler* hearing that there were valid reasons to excuse Prospective Juror V.B. (See, e.g., *People v. Cornwell* (2005) 37 Cal.4th 50, 70, disapproved on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th 390, 421, fn. 22 ["The juror's own remarks also clearly do not support an inference she was excused because of her race – on the contrary, despite her obvious intelligence and good faith, her voir dire disclosed a large number of reasons other than racial bias for *any* prosecutor to challenge her, including but not limited to her personal experience with an allegedly unfair homicide prosecution of a close relative and her express distrust of the criminal justice system and its treatment of African-American defendants."].)

### E. Prospective Juror V.K.

Also in response to defendant's first *Batson*/*Wheeler* objection, the court found a prima facie case and asked the prosecutor to state reasons for his removal of Prospective Juror V.K. The prosecutor replied:

> "[*H]er spouse is a senior pastor, and I'm always concerned with people from the clergy coming in because they have a lot of dealings and sympathy and that type of outreach.*

31

"And when [defense counsel] was questioning her and he was asking about what she thinks, she said he looks—*she said the defendant looks like a young man, groomed, in a nice suit, accurate observations, but it was the way she said it, and coming with the fact that her husband's a senior pastor, which to me means the head of a church, causes me great concern that she will increase my burden of proof and hold me to a higher standard of feel sympathy for the defendant*. Even if she things she can do it—even if she thinks she can be fair, based on her answers, I don't think she can be." (Italics added.)

According to the voir dire transcript, Prospective Juror V.K. said she was a special needs social worker with Kern Regional Center.[10] Her husband was a "senior pastor," and she did not further define his pastoral duties. She answered no to the entirety of the voir dire questions about prior contacts with law enforcement, whether she had been a crime victim, and exposure to pretrial publicity. Defense counsel asked if there was anything about defendant that made her already judge him as guilty. She replied: "No. I don't know him. He just looks like a young man, well-groomed, in a nice suit." When asked if her opinion would change if she saw photographs of defendant throwing gang signs, she replied: "Innocent until proven guilty."

The court denied defendant's *Batson/Wheeler* motion as to Prospective Juror V.K. and found the prosecutor stated a race-neutral justification for striking her "based upon the senior pastoral duties of her spouse and her answers to your questions."

On appeal, defendant argues the record undermines the prosecutor's stated justifications for removing Prospective Juror V.K. and the court's findings: her husband—and not Prospective Juror V.K.—was a pastor; she did not make any statements to indicate her husband's job would interfere with her ability to be an impartial juror; her statements were only made in response to the court's voir dire; the prosecutor failed to ask her any questions or engage in any meaningful examination; and

---

**10** In his appellate brief, defendant erroneously states Prospective Juror V.K. worked for "Kern Radiology."

the court merely found the prosecutor's reasons were valid without questioning the basis for his explanation.

The occupation of a prospective juror's spouse may be a legitimate nondiscriminatory reason for a peremptory challenge. (*People v. Rushing* (2011) 197 Cal.App.4th 801, 811–812.) The prosecutor's failure to specially question Prospective Juror V.K. on his stated concerns, by itself, "is of little or no consequence" since she responded to numerous questions from the court and defense counsel. (See, e.g., *People v. Lewis* (2008) 43 Cal.4th 415, 476, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919–920.)

In addition, for purposes of *Batson/Wheeler*, "a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." (*Purkett v. Elem*, *supra*, 514 U.S. at pp. 768–769; *Reynoso*, *supra*, 31 Cal.4th at p. 916.) For example, a peremptory challenge based on a prospective juror's experience in counseling or social services, and the prosecutor's concern that such a person might be too sympathetic to the defense, have been held as proper race-neutral reasons for excusal. (*People v. Clark* (2011) 52 Cal.4th 856, 907–908; *People v. Trevino* (1997) 55 Cal.App.4th 396, 411–412; *People v. Landry* (1996) 49 Cal.App.4th 785, 790–791; *People v. Watson* (2008) 43 Cal.4th 652, 677; *People v. Perez* (1996) 48 Cal.App.4th 1310, 1315.) In *People v. Mai* (2013) 57 Cal.4th 986, the court held that a prosecutor's "expressed reservation about having social workers on the jury was race neutral. It also had ' " 'some basis in accepted trial strategy' " ' [citation] insofar as it stemmed from a concern about the general attitudes and philosophies persons in that profession might harbor." (*Id.* at p. 1053.)

In this case, there is substantial evidence to support the prosecutor's stated justification for excusing Prospective Juror V.K. She was a social worker, her husband was a pastor, and her description of defendant as "a young man, well-groomed, in a nice suit" raised the prosecutor's concerns that she would be overly sympathetic to him.

33

## F. **Prospective Juror W.W.**

We now turn to the prosecutor's use of a peremptory challenge to excuse Prospective Juror W.W., which triggered defendant's second *Batson*/*Wheeler* objection. The People assert the prosecutor stated a valid race-neutral reason to excuse Prospective Juror W.W. because she was not satisfied with how the police treated her when she was assaulted, and the prosecutor was concerned that she had been on a jury which heard a civil suit for "police brutality."

But the entirety of the prosecutor's statements about Prospective Juror W.W. raise serious questions about the credibility of any purported race-neutral reasons. As set forth above, Prospective Juror W.W. stated in voir dire she had been a field representative in Kern County for the Department of Commerce for 22 years, and she collected information "for Congress and President and different organizations that distribute information back down to the cities and counties about work, the state of the nation, how people are doing health-wise…." She had two accounting degrees and her spouse worked for the city; he was not employed in law enforcement.

When defendant made his first *Batson*/*Wheeler* objection as to Prospective Jurors V.B. and V.K., the court noted Prospective Juror W.W. and two other African-Americans were still on the panel. For some reason, the prosecutor vigorously objected to the court's statement that Prospective Juror W.W. was African-American, and an extended discussion ensued. The court stated that she appeared to be African-American, but the prosecutor refused to concede the issue.

When the prosecutor subsequently excused Prospective Juror W.W., defense counsel immediately made another *Batson*/*Wheeler* objection. The prosecutor's initial response was to again say that Prospective Juror W.W. was not African-American. The court again rejected the prosecutor's statements and said that she was African-American. It found a prima facie case and asked the prosecutor to state his reasons. Here is the prosecutor's first reason:

34

"[THE PROSECUTOR]:    … Having found a prima facie case, [W.W.] is a –*she works for a liberal political organization where she provides information to the Democratic Party or Congress*—

"THE COURT:       *Did you hear 'commerce' and 'Congress' at different times?*

"[THE PROSECUTOR]:    I just heard 'Congress.'

"[DEFENSE COUNSEL]:  I only heard that of 'commerce.'

"THE COURT:        Did you hear 'commerce' too?

"[DEFENSE COUNSEL]:  I heard 'commerce.'  I never heard—

"THE COURT:        Several times.  [¶]  And I think the second thing [the reporter] had read did say 'Congress,' and I thought I heard her say 'Congress' too, but then she goes back to 'commerce.'  [¶]  *Didn't mean to interrupt you.*

"[THE PROSECUTOR]:    *But she deals with these liberal organizations for what I heard was Congress and collects—she did say she collects information for the government and I don't know—I mean, she could have political motives or anything like that.  I just don't know.  And I don't have all day to go into that.*"  (Italics added.)

This exchange raises several concerns.  A prospective juror's occupation may be a permissible, nondiscriminatory reason for exercising a peremptory challenge, and a prosecutor is entitled to believe that people involved in particularly professions or with particular philosophical leanings are ill-suited to serve as jurors because they are not sympathetic to the prosecutor.  (*People v. Chism*, *supra*, 58 Cal.4th at p. 1316; *Reynoso*, *supra*, 31 Cal.4th at pp. 924−925; *People v. Landry*, *supra*, 49 Cal.App.4th at pp. 790−791; *People v. Adanandus* (2007) 157 Cal.App.4th 496, 507−508; see, e.g., *People v. Barber* (1988) 200 Cal.App.3d 378, 394 [court noted peremptory challenges are often exercised against teachers by prosecutors on the belief they are deemed to be rather liberal]; *People v. Perez*, *supra*, 48 Cal.App.4th at p. 1315 [same; social services or caregiving fields]; *People v. Trevino, supra,* 55 Cal.App.4th at p. 411 [same; prospective jurors or their spouses in health care or social services fields]; *People v. Granillo* (1987)

35

197 Cal.App.3d 110, 120–121, fn. 2. [many prosecutors believe various professional people are too demanding or require certainty].)

In this case, however, the factual premise for the prosecutor's reason for excusing Prospective Juror W.W. from the jury is unsubstantiated in the record. Indeed, there is no evidentiary basis for the prosecutor's declaration that Prospective Juror W.W. worked for "a liberal political organization" and could have "political motives." Prospective Juror W.W. stated she had worked as a field representative for the Department of Commerce and collected information about the county residents which was reported to the President and Congress. She had the same job for 22 years, which meant she worked throughout presidential administrations and congressional majorities from both political parties. She never said she was affiliated with a particular political party.

It was only after the prosecutor stated his reason about Prospective Juror W.W.'s alleged "political motives," and the court and defense counsel made halting attempts to point out his error, that he mentioned her prior experience with the police and jury service on a "police brutality" case:

> "[S]he did have a problem with the police. She didn't like the way things were handled. And you think about what she wasn't happy with, she was unhappy that they didn't give her a ride home. Police aren't required to give her a ride home. So she's kind of holding them to a higher standard than they have.
>
> "And before that, when talking about her jury service, *the first case she mentions is the police brutality suit. So I think even if she doesn't know it, she's got a little bit of a bias there. When talking about her prior jury service, the first thing that comes to mind is a police brutality case and then later on she talks about a problem with police.*
>
> "So I think she's got a bias against police and potentially some sort of political motives. Those are my justifications, your Honor." (Italics added.)

36

The court summarily denied defendant's *Batson*/*Wheeler* objection and simply said that the prosecutor had "provided a race-neutral explanation. Defense has not proved any purposeful racial discrimination."

"Although we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror. [Citations.] When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva*, *supra*, 25 Cal.4th at pp. 385–386.)

" 'The trial court has a duty to determine the credibility of the prosecutor's proferred explanations' [citation], and it should be suspicious when presented with reasons that are unsupported or otherwise implausible [citations] …." (*Silva*, *supra*, 25 Cal.4th at p. 385.) "Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent [citation], it is another matter altogether when … the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge and the trial court has failed to probe the issue [citations]." (*Ibid.*)

The prosecutor misstated the record when he asserted W.W. worked for a "liberal political organization" connected to the "Democratic Party or Congress." Upon hearing this reason, both the court and defense counsel initially tried to clarify whether W.W. said "Commerce" or "Congress." However, the court did not attempt to pursue the matter. The prosecutor again asserted W.W. worked for and collected information for "these liberal organizations" and "she could have political motives." The court summarily denied the motion without pursuing the prosecutor's obvious inaccuracy about W.W.'s employment and the inference which he made from those erroneous assertions.

37

We are also concerned about the prosecutor's expression of doubt that W.W. was African-American, which he initially raised when he excused Prospective Jurors V.B. and V.K. It is understandable that a prosecutor would not want to be accused of systematically removing minorities from a jury panel. In this case, however, the prosecutor's repeated assertions that Prospective Juror W.W. may not be African-American undermine his subsequent claim that he excused her because of the race-neutral reason of her prior interaction with the police.

In *Reynoso*, *supra*, 31 Cal.4th 903, the court acknowledged *Silva's* concerns in cases where the prosecutor's stated justifications were contradicted by the record (*id*. at p. 922), and clarified that " 'great deference' " should be given to the trial court's findings under the following circumstances (*Reynoso* at p. 908).

> "Where … the trial court is fully apprised of the nature of the defense challenge to the prosecutor's exercise of a particular peremptory challenge, *where the prosecutor's reasons for excusing the juror are neither contradicted by the record nor inherently implausible* [citation], and where nothing in the record is in conflict with the usual presumptions to be drawn, i.e., that all peremptory challenges have been exercised in a constitutional manner, and that the trial court has properly made a sincere and reasoned evaluation of the prosecutor's reasons for exercising his peremptory challenges, then those presumptions may be relied upon, and a *Batson/Wheeler* motion denied, notwithstanding that the record does not contain detailed findings regarding the reasons for the exercise of each such peremptory challenge." (*Id*. at p. 929, italics added.)

However, *Reynoso's* conclusion "is inapplicable by its terms when … one of the stated reasons deemed by the trial court to be a 'legitimate' basis for excusing a prospective juror is contradicted by the record." (*People v. Long* (2010) 189 Cal.App.4th 826, 847.) "Doubt may undermine deference … when the trial court makes a general, global finding that the prosecutor's stated reasons were all 'legitimate,' and at least one of those reasons is demonstrably false within the limitations of the appellate record." (*Id*. at p. 845.)

We are faced with the narrow exception anticipated by *Reynoso* and *Silva*. Even given deferential review, there is no evidence to support the prosecutor's reason for removing Prospective Juror W.W. The prosecutor's reason was inconsistent with and unsupported by the record. While the court initially questioned the prosecutor's account of the record, it quickly apologized for interrupting him. There is simply an absence of factual support for the prosecution's explanation, and the court failed to adequately determine the credibility of the proffered justification.

We note that the prosecutor's acceptance of a panel containing some African-American jurors "strongly suggests that race was not a motive" in challenging other minorities on the panel. (*Lenix*, *supra*, 44 Cal.4th at p. 629.) The record implies that two African-American jurors (Nos. 8 and 9) were still on the panel when Prospective Juror W.W. was excused, and they were ultimately seated on this jury. However, the exclusion by peremptory challenge of a single juror on the basis of race is an error of constitutional magnitude requiring reversal. (*People v. Chism*, *supra*, 58 Cal.4th at p. 1316; *Silva*, *supra*, 25 Cal.4th at p. 386; *Bonilla*, *supra*, 41 Cal.4th at pp. 340–341.)

We acknowledge the prosecutor stated two race-neutral concerns about Prospective Juror W.W., based on her prior experience with police and service on a jury in a civil suit involving police brutality.[11] " 'We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement.' [Citation.]" (*Lenix*, *supra*, 44 Cal.4th at p. 628.) The apparent race-neutral reason of Prospective Juror W.W.'s reaction to the police response when she was assaulted was "apparent from and 'clearly established' in the record." (*Scott*, *supra*, 61 Cal.4th at p. 384; *People v. Cunningham* (2015) 61 Cal.4th 609, 665.)

---

[11] We are not persuaded by the prosecutor's suggestion that Prospective Juror W.W.'s referencing a police brutality case first in order among several cases on which she previously served as a juror necessarily suggests bias.

39

However, the prosecutor only stated these reasons after he refused to concede Prospective Juror W.W. was African-American, expounded on her alleged employment by a "liberal political organization," and the court and defense counsel attempted to tell him that his version of Prospective Juror W.W.'s voir dire response was erroneous. In *Miller-El*, *supra*, 545 U.S. 231, the United States Supreme Court granted federal habeas corpus relief and held that the state court's reasons supporting the absence of racial discrimination in the capital inmate's jury selection process were not supported by clear and convincing evidence. (*Id.* at p. 266.) *Miller-El* engaged in a comparative juror analysis which showed "that race was significant in determining who was challenged and who was not." (*Id.* at p. 252.) In further rejecting the prosecutor's reasons for striking a prospective African-American juror, *Miller-El* characterized as an afterthought the prosecutor's explanation – the prospective juror's brother had a prior conviction – because he provided it only after defense counsel had discredited an earlier-stated reason as patently false. (*Id.* at p. 246.) As in *Miller-El*, we similarly find the prosecutor's reliance on Prospective Juror W.W.'s interaction with the police was raised only after the court and defense counsel attempted to question his characterization of her employment and speculation about her political views.

In evaluating the prosecutor's justifications for excusing a prospective juror, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." (*Purkett v. Elem*, *supra*, 514 U.S. at p. 768; *Reynoso*, *supra*, 31 Cal.4th at p. 916.) "Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised." (*McClain v. Prunty* (9th Cir. 2000) 217 F.3d 1209, 1221; *People v. Boyette* (2002) 29 Cal.4th 381, 471–472; *Castellanos v. Small* (9th Cir. 2014) 766 F.3d 1137, 1148; *Caldwell v. Maloney* (1st. Cir. 1998) 159 F.3d 639, 651.)

We conclude the trial court's ultimate determination – that defendant failed to meet his burden of proving intentional discrimination as to the removal of Prospective Juror W.W. – is not supported by the record and unreasonable in light of the evidence of the voir dire proceedings and the court's failure to "take the next, necessary step of asking whether the asserted reasons actually applied to the particular juror[]" being excused by the prosecutor. (*People v. Fuentes* (1991) 54 Cal.3d 707, 721; *Silva*, *supra*, 25 Cal.4th at p. 385.) Defendant's convictions therefore must be reversed. (*Batson*, *supra*, 476 U.S. at p. 110; *Wheeler*, *supra*, 22 Cal.3d at p. 283; *People v. Cisneros*, *supra*, 234 Cal.App.4th at p. 120.)

## II. Substantial Evidence for Count III*

Defendant contends there is insufficient evidence to support his conviction in count III for possession of an assault rifle in violation of section 30605, based on the Russian-made SKS semiautomatic loaded assault rifle with a detachable magazine found in the trunk of the black Impala. Defendant concedes he drove the Impala to the scene and left it there. He also concedes the weapon in the trunk was an assault rifle, and the charged offense is a general intent crime. However, he argues there is no evidence he knowingly possessed the assault rifle, he had access to the trunk, or he knew the gun was there.

While we have reversed defendant's convictions in counts III and IV because of *Batson/Wheeler* error, that reversal permits retrial for those two charges. However, if there is insufficient evidence for count III, a retrial would be barred. We will thus review defendant's substantial evidence challenge to count III.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the

---

* See footnote, *ante*, page 1.

defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1988) 18 Cal.4th 297, 331.) "The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence." (*People v. Bean* (1988) 46 Cal.3d 919, 932; *People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

Section 30605, subdivision (a) prohibits any person from possessing any assault weapon. It continues, without substantive change, former section 12280, subdivision (b), which was part of the Roberti-Roos Assault Weapons Control Act of 1989 (AWCA) and banned the possession of a semiautomatic rifle by a private citizen. (*People v. Zondorak* (2013) 220 Cal.App.4th 829, 832, fn. 1.)

To convict a defendant under the AWCA, the People must prove that the defendant knew or should have known that the firearm he possessed was an assault weapon. (*In re Jorge M.* (2000) 23 Cal.4th 866, 887 (*Jorge M.*).) *Jorge M.* held that "actual knowledge regarding the firearm's prohibited characteristics is [not] required." (*Id.* at p. 869.) "The gravity of the public safety threat addressed in the AWCA, however, together with the substantial number of prosecutions to be expected under it and the potential difficulty of routinely proving actual knowledge on the part of defendants, convince us [former] section 12280(b) [current section 30605] was not intended to contain such an actual knowledge element." (*Id.* at p. 887.) Instead, the People "bear the burden of proving the defendant *knew or reasonably should have known* the firearm possessed the characteristics bringing it within the AWCA." (*Ibid.*, italics added, fn. omitted.)

"The question of the defendant's knowledge or negligence is, of course, for the trier of fact to determine, and depends heavily on the individual facts establishing possession in each case. Nevertheless, we may say that in this context the Legislature presumably did not intend the possessor of an assault weapon to be exempt from the

42

AWCA's strictures merely because the possessor did not trouble to acquaint himself or herself with the gun's salient characteristics. Generally speaking, a person who has had substantial and unhindered possession of a semiautomatic firearm reasonably would be expected to know whether or not it is [an illegal assault weapon] …." (*Jorge M.*, *supra*, 23 Cal.4th at pp. 887−888.)

"Possession may be actual or constructive. Actual possession means the object is in the defendant's immediate possession or control. A defendant has actual possession when he himself has the weapon. Constructive possession means the object is not in the defendant's physical possession, but the defendant knowingly exercises control or the right to control the object. [Citation.] Possession of a weapon may be proven circumstantially, and possession for even a limited time and purpose may be sufficient." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831.)

In this case, there is circumstantial evidence to support defendant's knowing and constructive possession of the assault rifle. He drove the black Impala to the scene and parked it in front of Ramirez's house, raising the obvious inference that he had the keys to the vehicle. After Abrego was shot, defendant disappeared from the scene and left behind the car, still parked in the same place in front of Ramirez's house. The police never found the keys to the car or the trunk, raising the inference that defendant still had the keys when he left. While the car was registered to Steven, defendant's fingerprints were on the vehicle. When the police attempted to serve the search warrant at the house where defendant's sister lived, she followed their directions and walked out with her family, but defendant refused to leave. After an extended stand-off, the SWAT team fired tear gas into the house and defendant surrendered. In one bedroom, the police found defendant's wallet with his identification. They also found a plastic bag near his wallet. The bag contained the identical and very distinct ammunition which was loaded into the assault rifle and its magazine. We find this compelling circumstantial evidence supports defendant's conviction.

## DISPOSITION

Defendant's request for judicial notice filed on February 8, 2016, is granted.

Defendant's convictions for count III, possession of an assault weapon, and count IV, active participation in a criminal street gang, and the 12-year sentence imposed, are reversed for *Batson*/*Wheeler* error. The matter is remanded for further appropriate proceedings, including possible retrial on counts III and IV.

_____
POOCHIGIAN, ACTING P.J.

WE CONCUR:


_____
DETJEN, J.


_____
PEÑA, J.