Filed 3/27/24; On remand

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F080361 |
| Plaintiff and Respondent, | (Kern Super. Ct. No. BF171239B) |
| v. | |
| FERNANDO ROJAS, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Sharon Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Daniel B. Bernstein, Robert Gezi, Amanda D. Cary, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.110(b) and 8.1110, this opinion is certified for publication with the exception of part I. of the Discussion.

Defendant Fernando Rojas's fellow gang member shot and killed an individual with whom defendant had an altercation moments prior. Defendant was convicted of first degree murder with a gang special circumstance finding; and active gang participation.

The Attorney General concedes that, as a result of the passage of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), defendant's conviction for active gang participation and several enhancements must be reversed. We accept that concession.

We reject defendant's remaining contentions, including a *Batson*/*Wheeler*[1] claim and a challenge to his gang-murder special circumstance.

As a result, we reverse the active gang participation conviction and several enhancements, but otherwise affirm.

## BACKGROUND

In an amended information filed August 14, 2019, the Kern County District Attorney charged defendant Fernando Rojas with premeditated murder (count 1; Pen. Code, §§ 187, subd. (a), 189),[2] active gang participation (count 2; § 186.22, subd. (a)), and possession of a firearm as a felon (count 4; § 29800, subd. (a)(1).)[3] The information further alleged: Defendant committed the murder for the benefit of, at the direction of, or in association with the Varrio Chico Lamont criminal street gang; firearm enhancements to the murder count under sections 12022, subdivision (d) and section 12022.53, subdivisions (d) and (e)(1); an out-on-bail enhancement (§ 12022.1); a prior juvenile adjudication strike (§ 667, subds. (c)–(j), § 1170.12, subds. (a)–(e)); and three prior prison term enhancements (§ 667.5, subd. (b)).

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2] All further statutory references are to the Penal Code unless otherwise stated.

[3] Codefendant Victor Nunez was also charged with counts 1 and 2, as well as possession of a firearm as a misdemeanant (count 3; § 29805.)

The court granted defendant's motion for acquittal on count 4 (§ 1118.1). A jury convicted defendant on counts 1 and 2. The jury also found true the gang enhancement (§ 186.22, subd. (b)(1)), gang-murder special circumstance (§ 190.2, subd. (a)(22)), and firearm enhancements under sections 12022.53, subdivisions (d) & (e)(1) and 12022, subdivision (d) as to count 1.

The court granted a prosecution motion to dismiss the on-bail enhancement and prior conviction enhancements. The court found true the prior strike adjudication allegation.

The court sentenced defendant to life in prison without the possibility of parole on count 1, plus 25 years to life (§ 12022.53, subds. (d) & (e)(1)), plus three years (§ 12022, subd. (d)), plus a stayed (§ 654) term of six years on count 2. The court imposed various fines and fees, including a parole revocation restitution fine of $300. (See § 12022.45.)

## FACTS

Surveillance footage from an internet casino showed defendant arriving in a silver BMW at around 1:15 a.m. on February 3, 2018. Defendant entered the casino, whereafter he and Nunez conversed, drank beer, and played a casino game.

At around 2:04 a.m., a man named Brandon Ellington was outside the casino exchanging something with an individual whose car door was open. Ellington had something in his hand. A package of marijuana was later found in his pocket. An unidentified individual hit Ellington in the face.

Around the same time, defendant walked out with an unknown individual. Nunez was standing at the entrance. Defendant extended his left arm while holding what appeared to be a beer bottle. Ellington took off his shirt, squared off against defendant, and extended both of his arms over his head. Defendant threw the beer bottle. Ellington then left the view of the camera.

Defendant and Nunez jogged to their BMW toward the entrance of the casino. Defendant drove the BMW away from the casino with Nunez in the front passenger's seat. Defendant made a northbound turn onto South Union Avenue at about 2:08 a.m.

Surveillance footage from a nearby store showed a silver BMW pulling up near Ellington. The footage shows an individual exiting the passenger's side followed by muzzle flashes. Ellington ran toward a nearby market after being struck by a bullet. Eventually, Ellington collapsed. His body was later found by law enforcement at that location. The shooter then reentered the BMW which sped away.

Ellington had suffered a gunshot wound to his chest. The wound was lethal, striking Ellington's left lung, heart, and then right lung before exiting the body. The wound had "stippling" – which is partial gunpowder burns. However, the wound had no visible soot. Based on "rough generalizations," a pathologist testified that stippling without soot is consistent with the firearm being between six to 18 inches away from the victim when the lethal shot was fired. Ellington also had blunt force injuries.

Five spent nine-millimeter shell casings were found at the scene.

On February 9, 2018, an undercover officer arrested defendant at the same internet casino. The same day, officers located Nunez hiding behind a shipping container in a parking lot. Nunez tossed a black handgun away before surrendering. A criminalist from the regional crime laboratory testified that, in his opinion, it was the gun that fired the spent casings at the scene. The DNA profile on the gun matched Nunez.

Defendant denied involvement to law enforcement. He said he heard about the shooting from other people and from newspapers but was not personally involved. Defendant initially claimed he was not even at the internet casino on the night Ellington was killed. However, officers showed him a still photograph from the surveillance footage, and defendant admitted he was depicted therein. Defendant then admitted he was drunk. Defendant claimed Ellington had a knife, was saying things like, "I'll kill all

you guys," and "white pride." However, defendant consistently denied involvement in the shooting.

Defendant said he had "connections" and that everyone knew he was "from the streets." Defendant said people listen to him because he is a "big guy."

Officers asked defendant if he was involved in gangs in Lamont. Defendant claimed he was not currently active.

Deputy Sheriff Fernandez testified as a gang expert for the prosecution. Fernandez testified about a Kern County gang called Varrio Chico Lamont, including common tattoos among its members, their hand signs, primary activities, and predicate offenses.[4] Varrio Chico Lamont is a subset of Lamont 13.

Deputy Fernandez testified that "respect" is one of the primary things a member of the Varrio Chico Lamont gang seeks. If a perceived disrespect to a member of Varrio Chico Lamont went unanswered, the disrespected member would lose standing in the gang. Thus, disrespected members would be required to respond, usually with violence, to "save face."

Gang members also commit violent crimes like murder to enhance their reputation within the gang and the gang's reputation in the community. This reputation enhancement discourages people from "talk[ing]" to law enforcement, which allows the gang to continue committing crimes.

Another officer also testified about prior contacts with defendant suggesting his involvement with the Varrio Chico Lamont gang. Defendant had several tattoos that Deputy Fernandez believed were gang related, including one that read, "VCL," two that read, "Lamont," and a street sign with the street names "Santa Clara" and "Kearney."[5] Fernandez opined that defendant and Nunez were active members of the Varrio Chico

---

[4] Defendant and Nunez were not involved in the predicate offenses.

[5] The area around the intersection of these two streets was a "stronghold" area for the gang.

5.

Lamont gang on February 3, 2018. Fernandez also testified that a hypothetical crime aligned with the prosecutor's view of the evidence would be considered to have been committed "in association with" the Varrio Chico Lamont gang.

## DISCUSSION

**I.** **Defendant Has Not Established Reversible Batson/Wheeler Error**[*]

**A.** *Background*

Defendant argues on appeal that the prosecutor's reasons for dismissing three specific jurors with Hispanic surnames – A.M., A.L., and C.C.[6] – were not plausible or reasonable.

The jurors filled out a prospective juror questionnaire. The questionnaire explained that any questions or concerns based on the prospective juror's answers would be addressed outside the presence of other jurors. The questionnaire asked the following questions:

> "1.    Have you ever been affected, directly or indirectly, by gang activity or gang violence?
>
> "2.    Has anyone close to you, such as a friend or relative, ever been affected, directly or indirectly, by gang activity or gang violence?
>
> "3.    Have you ever been accused of being in a criminal street gang?
>
> "4.    Has anyone close to you, such as a friend or relative, ever been accused of being in a criminal street gang?
>
> "5.    Have you ever witnessed or investigated, formally or informally, any act of alleged gang crime?

---

[*] See footnote, *ante*, page 1.

[6] While potential jurors are not afforded the same confidentiality as seated jurors, we will be discussing in this opinion answers they provided on a questionnaire labeled "confidential" and therefore suppress both first and last names. It is important to note that the Attorney General agrees that all three individuals have "Hispanic surnames."

"6.     Do you have a special gang-related concern that would make it extremely difficult for you to sit as a juror in this case?

"7.     Do you have any training or education about criminal street gangs?

"8.     If you answered 'yes' to any question above, is that going to affect your ability to give all sides a fair trial?

"9.     This case is expected to last through September 20, 2019.  We will not be in session on September 2, 2019 (Monday) and September 12–13, 2019 (Thursday and Friday).  Do you have any hardship that would make it difficult for you to serve as a juror in this case?

Prospective jurors who answered "yes" to any of the questions were brought in for individual questioning.  Prospective jurors who answered "no" to all of the questions were asked to return later for general voir dire.

C.C. and A.L. answered "no" to all the gang-related questions and were asked to return for general voir dire.[7]

A.M. answered "yes" to question four.  When asked to explain his answer, A.M. stated:

"It was, like, a while ago.  It was a couple years back.  But a friend of mine, it's 'cause he had, like, tattoos, but they were just like words and stuff like that, and one day we were just, like, walking around the store and a police officer stopped us.  He just wanted to check and see if he was related to any type of gang.  That was pretty much it."

The court asked if his friend was part of a gang and A.M. responded, "No, he was not."

The court asked A.M. if he would be able to set aside what he and his friend went through and keep it separate from the case.  A.M. replied, "Of course."  A.M. said he could give all sides a fair trial.

Neither defense counsel had questions for A.M.  When the prosecutor was given the opportunity to ask questions, the following exchange took place:

---

[7] A.L. and A.M. responded "yes" to the hardship question.

"Q. The writing that you were talking about, the tattoos, what did it say?

"A. It was just more like peace words and stuff like that, like freedom, stuff like that.

"Q. Okay. So did you view that as like a negative experience with law enforcement or just like it was an experience with law enforcement.

"A. It was just an experience.

"Q. And your friend, did he view that as a negative experience?

"A. I haven't talked to him in years after that, but he – he was more like less respected with it. He didn't really respect cops after that. I don't know, he was just like – he didn't enjoy the cop's company, the police, unfortunately, at all.

"Q. And you are not real good friends with him anymore?

"A. No. It's been years."

A.M. was asked to return for general jury voir dire.

During general jury voir dire, the court asked prospective jurors if they knew anyone who worked in law enforcement or the legal profession. A.M. said he volunteers at the Sheriff's Activities League and had met three sheriffs there. A.M. told the court this would not affect his vote as a juror. None of the sheriffs he met were on the witness list for the present case.

Later in voir dire, the court asked the following question of prospective jurors:

"If you were not here today, what would you be doing? If you work outside of the home, what type of work do you do? I do not need to know the name of your employer unless you work for a public or government entity. …

"If you have a significant other, we would like to know that. If that significant other works outside of the home, what type of work does that person do?

"If you have children, how many do you have, what are their approximate ages, and what are they doing for a living?

"I do not want to know your physical residential address, but I would like to know in which part of the county you reside; so if you live in Bakersfield, you can identify it by region, such as northeast, northwest, central, southeast, southwest, et cetera. If you live outside of Bakersfield, you can identify it by the city name in which you live, so Wasco, Tehachapi, Delano, Wofford Heights, et cetera."

To this question, A.L. responded:

"I'm a preschool teacher, and my significant other is a manager that works with people of special needs. I have four children, 11, nine, four, and one. They're all in school or in daycare. And we live in the southwest."

Responding to the same question, A.M stated:

"I work as a production worker for Bolthouse and my significant other is currently a college student. I have no children. And I live in the northwest."

When it was time for counsel to ask questions, defense counsel asked one of the prospective jurors whether she understood that the prosecutor had the burden of proof even if the defense did not make arguments or do anything at all. After she responded affirmatively, defense counsel said, "[A.M.], you're nodding your head. Do you agree with that?" A.M. responded, "Yeah, I'm nodding." Counsel then asked what A.M. thought about the possibility of defendant Nunez choosing not to testify. A.M. responded, "It's his choice."

Later, counsel for Nunez had the following exchange with A.L.:

"Q. You've never been on a jury before. Is that right?

"A. No.

"Q. Have you ever been called up for jury service?

"A. Yes.

"Q. And up here where you're answering questions?

"A. Yes.

"Q. And you're a preschool teacher?

9.

"A.     Correct.

"Q.     So you have a college degree?

"A.     Yes.

"Q.     And I didn't hear what you husband does.

"A.     He's a supervisor that works with – in a group home with people of special needs.

"Q.     Like older people?

"A.     No. They range from different ages.

"Q.     And how long have you been a preschool teacher?

"A.     Ten years now.

"Q.     And you have four minor children. Is that right?

"A.     Yes.

"Q.     Do you have any exposure to the criminal justice system, like, you know, maybe you read a lot of newspaper articles about it or you know someone that talks to you about it or you watch TV shows?

"A.     I live a very sheltered life because of my kids.

"Q.     Okay.  Spend all your time with your kids.

"A.     Pretty much.

"Q.     Do you know about our jury system and how it works, for the most part?

"A.     Yes, I do.

"Q.     And you understand how important it is to be fair and impartial?

"A.     Yes, I do.

"Q.     And how important it is to follow the law the judge gives you as he gives it to you, even if you don't agree with it?

"A.     Yes.

"Q. And you think you can do that?

"A. Yes.

"Q. Is there anything about the nature of this case that you think may cause a problem for you being a juror –

"A. No.

"Q. -- with very serious charges?

"A. No.

"Q. Nothing?

"A. Nothing."

Later still, counsel for Nunez had the following exchange with A.M.:

"Q. [A.M.], I didn't get down what you do for a living.

"A. Right now I'm just doing production work at Bolthouse.

"Q. At Bolthouse?

"A. Yeah.

"Q. That's like an agricultural company?

"A. Yeah, pretty much.

"Q. Is that in Delano?

"A. No. It's actually here in Bakersfield.

"Q. And how long have you been doing that?

"A. For only a couple months. I think three.

"Q. And how old are you?

"A. Nineteen.

"Q. Nineteen. Okay. [¶] So you just got out of high school pretty recently?

"A. Yeah.

11.

"Q.    Class of –

"A.    2018.

"Q.    '18?

"A.    Yeah.

"Q.    And what part of the county do you live in?

"A.    I'm not too sure, but I live by, like, Pioneer.

"Q.    Pioneer?

"A.    I'm not too sure of that area.

"Q.    Is that like east Bakersfield?

"A.    Pretty much.

"Q.    And do you live with your parents?

"A.    Yeah.

"Q.    And are you working full-time?

"A.    Yeah, I work full-time.

"Q.    And you said you're finding the time to volunteer at the Sheriff's Activities League, right?

"A.    Yeah.

"Q.    When do you do that?

"A.    I haven't done it in a couple months because I work graveyards. The time they open is usually around 4:00. That's the time I start work.

"Q.    What kind of volunteer work did you do there?

"A.    I would help out with like – 'cause they teach boxing there. I would help out moving the ring or teach kids how to box.

"Q.    So you were working with kids in sports?

"A.    Yeah.

"Q. Do you have a boxing background?

"A. I used to box for a couple years.

"Q. Okay. Do you have any plans or goals to become a sheriff's deputy or law enforcement?

"A. No.

"Q. You're just there to help the kids?

"A. Yeah."

Defendant's counsel asked the prospective jurors how much they wanted to be a juror in the case, on a scale from one to 10. A.L. said "five" because "it sounds interesting," but she did not "like the length of it, how long it's supposed to go" because her oldest child was going to camp. Her oldest usually walked one of his siblings to school, so A.L. wondered what she was going to do. A.M. responded to the same question: "around eight."

The prosecutor explained aider and abettor liability to prospective jurors and observed that a person could be liable for a bank robbery even though they were "just the driver" and "never set foot into the bank." The prosecutor asked A.M. if he was "okay with the law being that way." He responded, "Yes."

Later, the prosecutor and A.M. had an exchange wherein A.M. said he had volunteered with the Sheriff's Activities League for four years and planned to resume volunteering there once his work shift changes. A.M.'s "significant other" was a college student studying English and psychology and was living with her mother.

The prosecutor later posed a hypothetical to A.L. and the following exchange ensued:

"Q. [...] Say all of you are chosen to be on this jury and we go in the back and I take my cell phone out and I start playing Words with Friends. We've already listened to all the evidence in the case and it's time to deliberate, right, and we go in the back and I get on my phone. What would you do? [¶] [A.L.], what would you do in that situation? And say you're the foreperson

13.

"A.    I would tell the individual to put that phone away and let's talk about what we're supposed to be doing, focus.

"Q.    So we're role-playing.  It's me that's on the phone and I'm going to respond I have a high score, we listened to the same evidence, just let me know how you guys vote.

"A.    I would tell you put it away.

"Q.    It's a high score.

"A.    I don't care.  Put it away.

"Q.    That's mean.  [¶]  Say I continue to do that and I don't listen to you. What do you do next?

"A.    I would probably talk to the judge and let him know hey, you know what, this friend right here is not listening to me."

**B.    *Challenges***

Outside the presence of the venire, defense counsel jointly challenged L.C. and E.R.  The court dismissed E.R.R. for hardship reasons.

The prosecutor exercised a peremptory challenge on A.M.  The defense then jointly exercised a peremptory challenge on prospective juror Jo.B.  The prosecutor next exercised a peremptory challenge on prospective juror, A.H.  The defense then exercised a joint peremptory challenge to prospective juror E.B.  The dismissed prospective jurors were replaced, the new panel members were questioned, and challenges resumed.  The prosecutor exercised a peremptory challenge on A.L.  The defense jointly exercised a peremptory challenge as to V.H.

The prosecutor stated he accepted the jury panel as constituted.  The defense jointly exercised a peremptory challenge as to prospective juror G.A.  The prosecutor then again accepted the panel as constituted.  The defense jointly exercised a peremptory challenge as to prospective juror M.W.  Again, the prosecutor accepted the panel as constituted.  The defense jointly exercised a peremptory challenge as to prospective juror P.R.  P.R. was replaced on the panel by prospective juror D.M., who the prosecutor then

14.

dismissed with a peremptory challenge. The defense jointly exercised a peremptory challenge as to prospective juror C.H.

Additional prospective jurors were called forward, including C.C. The court asked the new prospective jurors to provide the personal information previously provided by other prospective jurors. C.C. explained she is an "administrative assistant/ACES mentor" for a school district and lived in Delano. C.C. was single and had no children.

Later, C.C. said:

> "I can follow the concept of the law. I don't have prior jury service. I've never been a victim of a crime, close to me either, anybody close to me. Nobody close to me has been charged or accused of committing a crime. I do know I have a cousin and two uncles who are retired from the prison. And then my cousin, he's a counselor as Wasco State Prison. I don't recognize anybody from the witness list. I don't recognize attorneys or defendants. I don't recognize my prospective jurors. And I can follow the law as instructed in this case."

Nunez's counsel asked if there was anything about her relatives' jobs that would affect her decision as a juror, and C.C. responded, "No, sir."

Counsel later asked what her job entailed, and C.C. explained: "Mainly I work with the extended learning program, so I just get the day ready for all the managers of the after-school program and daycare programs. I'm the director of the extended learning program." The extended learning department included afterschool programs, preschool, summer school and daycare.

C.C. was currently in college and did not have a teaching credential or college degree.[8] She planned to earn a degree in early childhood development and become a teacher after obtaining a credential in special education and general education. In later questioning, she said she definitely wanted to become a teacher but was not sure about special education versus general education.

---

[8] C.C. later said she would *starting* her bachelors program in January.

15.

When asked what she thought of the criminal justice system, C.C. said, "I really don't pay mind to it." C.C. said good jurors were important to a fair system and that she believed she could be a fair and unbiased juror.

Defendant's briefly questioned C.C. about whether jury service would interfere with her college studies. C.C. said it would not affect her educational advancement because she was studying online.

When asked how much she wanted to be on the jury on a scale from one to 10, C.C. responded, "Like an eight." When asked why, she said, "I'm interested and, like I mentioned before, I've never experienced this and I would like to experience it." She said, "Since I never pay mind to it, I thought since I'm here I might as well do it."

The challenge process eventually resumed, beginning with the prosecutor. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror L.D. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror Ji. B. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror S.S. S.S. was replaced by C.C., who the prosecutor dismissed with a peremptory challenge.

The defense then made a motion pursuant to *Wheeler*, *supra*, 22 Cal.3d 258 and *Batson*, *supra*, 476 U.S. 79. Defendant's counsel argued the prosecutor had dismissed four jurors of Hispanic descent "based upon their names and visual."

The prosecutor responded by observing that he had accepted the panel with people of Hispanic descent on numerous occasions only to have them removed by the defense. The prosecutor acknowledged C.C. was of Hispanic descent based on her appearance and name. The prosecutor explained, "Her responses in regards to the field that she wants to go into and her physical demeanor on Friday were things that I looked at in terms of dismissing her, and appears that she lacks, I guess, the life experience that I'm looking for in a case like this."

16.

The prosecutor then offered his explanation for the other three dismissals:

"The People's 3rd was [A.L.] who was similarly situated; although, she was a little bit older. But her responses in regards to wanting to be on the jury and the type of job that she has was concerning to me. I had thought about it, I ended up dismissing her.

"My second was [D.M.]. She's the one who had green hair. All of it was green. She was young, she had multiple visible tattoos, which was concerning for me. Her responses in the gang questionnaire concerned me.

"And then the first person I believe I dismissed was [A.M.] His lack of life experience was the biggest thing for me in terms of being able to sit through the jury, listen to the evidence, the length of it. I don't believe he had the experience to be able to listen to all of it, weigh it, and then finally come to a conclusion."

Counsel for Nunez said he intended to challenge the dismissal of C.C. specifically. He said he did not notice any issues with C.C.'s body language, that she appeared to be intelligent and was "gainfully employed." Counsel argued the prosecutor's stated reasons for dismissing C.C. were "quite vague" and insufficient.

Defendant's counsel challenged the dismissal of all four prospective jurors with Hispanic surnames. Counsel observed A.M. volunteered as a boxing coach. He argued that while A.M. was 19 years old, that did not mean he did not have sufficient life experience to judge any case. He said that did not appear to be an issue with respect to A.M.

Defendant's counsel acknowledged that A.H. had been injured in an attempted robbery but had fully recovered. A.H. had some knowledge of gangs, but not extensive knowledge.

Defendant's counsel observed D.M. had a job as a coach for developmentally disabled individuals. He argued, "I don't know what raises concern, in this day and age, about tattoos on a woman's body anymore, considering the number of people I've seen and number of women I've seen with tattoos on their body." Defendant's counsel acknowledged that D.M. "had family and friends that are affected by gangs, family

17.

members involved in gangs, including shot and killed in Kern County, has some in prison doing life."

With respect to C.C., defendant's counsel said the prosecutor had asked very few questions of her. Counsel observed C.C. was intelligent, educated, and fairly articulate.

The court found that a prima facie case had been made because the four jurors were members of a cognizable group. The court asked the prosecutor to restate why he had released the four jurors.

In discussing A.H., the prosecutor said he was concerned with his body language during questioning, his responses to the gang questionnaire, and the fact he was from Delano. The prosecutor also said,

> "[H]e still maintains friendships with gang members and he was freely admitting that. To me that's a little bit concerning. These weren't family members, they were friends of his. If he's willing to associate with individuals like that, then, to me, it's showing poor judgment. And, based on that, I did let him go."

The prosecutor then discussed A.L. as follows:

> "[A.L.] was the preschool teacher. She had been doing that for ten years, dealing with special needs. The [*sic*] she had never been on a jury before. She gave a response of five as to wanting to be here or not. I haven't had much luck with teachers in that area in my previous trials. She also has – I think even though she wanted to be on the jury, she stated it was a five, but she wanted to see what it's like, her body language and with that background and schooling, it was concerning to me. And considering I have 30 preempts total, I figured why take a chance on somebody versus someone that I think would be better for me. So based on that, I dismissed her."

The prosecutor then discussed A.M. as follows:

> "[A.M.] is the one who volunteered at SAL. Stating he was 19, that lack of life experience. He's working a production type job at Bolt House. The desire to work at SAL was not in terms of wanting to be a peace officer. I followed up on that. He said he had no intention of being a peace officer. His appearance in court, I noted that he kind of wore, couple days in a row, some of the same items of clothing. Concerning to me as well.

18.

When you take all these factors into consideration, I have 30 preempts, I did exercise my peremptory on him as well."

Later, the prosecutor discussed C.C. as follows:

"[C.C. is] from Delano. Yes, she does have a good job as an admin assistant; however, she still is young and how her projected – her intended field of study, which is to be a teacher and possibly be a special ed, as my previous individual, [A.L.], I have concerns of individuals that I believe they're very sympathetic in how they view things. I want a juror who's going to be able to view things without sympathy or bias. And those are questions I went into, that my personal experiences that the teachers in that field tend to go into that for some reason and, based on that, I did dismiss her."

The prosecutor then referenced that he frequently accepted the panel as constituted. The court said, "Just for the record … it appears that you accepted three times in a row, followed by four times in a row. So you have accepted seven separate times."

The court then stated its ruling as follows:

"The court does accept [the prosecutor's] representations that he released five individuals for group neutral reasons. Some reasons that have been articulated following the category of juror characteristics such as age, body language, as well as an unconventional lifestyle, those certainly do qualify as juror characteristics that are group neutral and do not apply, specifically, to one cognizable group.

"Additionally, the reference to concerns regarding the gang questionnaire certainly appeared to be genuine. And to the extent it would rise to the level of a concern, to exercise or justify a peremptory challenge is understandable, given the nature of this particular case.

"As it relates to [A.L.], she was an individual that was spoke to involving her scheduling and so forth, and to the extent [the prosecutor] has indicated his reluctance to keep her on this panel, recognizing that she is a teacher, how she placed herself on a scale from 1 to 10, in addition to her body language, those, likewise, would fall under the category of jury characteristics and would, therefore, justify group neutral reasoning.

"To the extent there have been a number of Hispanic individuals who have been accepted on the panel, at one time or another, the court does not look for a pattern of discrimination. While that was the law quite a few

19.

years ago, it is no longer the case and a *Batson/Wheeler* motion can be run, even on a single peremptory challenge, since it does not affect an individual's due process rights as it relates to a discriminatory purpose for any individual being released from the panel without justification or without a group neutral reason.

"So while I do understand and place it in its proper context that the panel has been accepted seven separate times with individuals remaining on the panel that appear to be of Hispanic descent does not sway this court in any particular fashion. Only to the extent the court can consider it for the limited purpose of determining how many additional individuals are on this panel of Hispanic origin.

"But for purposes of releasing these individuals specifically, while opposing counsel might not agree with the reasoning behind releasing an individual when considering the totality of the circumstances of the individual's representations, this court must consider it as it relates to the reasons stated by the party who is exercising a peremptory challenge to release the individual and determine whether those reasons are genuine or fabricated.

"It appears to the court that [the prosecutor's] reasoning, as stated on the record two separate times, certainly do qualify as neutral reasons for purposes of a defense to this motion. On that basis, the court is going to deny the *Batson/Wheeler*."

**C.**     *Analysis*

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' [Citation.] ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' [Citation.] The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760 (*Holmes*).)

" ' "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' [Citation]." (*Holmes*, *supra*, 12 Cal.5th at p. 760.)

" ' "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons.  … All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." ' [Citation.]  ' "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*People v. Miles* (2020) 9 Cal.5th 513, 539 (*Miles*).)

" ' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " ' [Citation.]  However, ' "[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." ' " (*Miles*, *supra*, 9 Cal.5th at p. 539.)

"Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's

21.

reasons for the challenges. 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' " (*Miles*, *supra*, 9 Cal.5th at p. 539.)

Defendant acknowledges that trial court need not make specific comments on each reason asserted by the prosecutor. However, defendant observes that global findings are not permitted where the prosecutor's stated justifications are implausible or unsupported by the record. As explained below, defendant has failed to show the prosecutor's stated justifications are implausible or unsupported by the record (except, arguably, as to A.L.'s profession discussed below). Therefore, we reject defendant's claim the trial court failed to address each reason asserted by the prosecutor.

### D.    *A.M.*

Defendant acknowledges that the prosecutor stated he dismissed A.M., in part, because of youth and inexperience. He further concedes that those are permissible bases for peremptory challenges. Yet, later defendant argues A.M. did not display an inability to evaluate the facts of this relatively simple case. However, we are concerned with "the subjective genuineness" of the reason given by the prosecutor, "*not* on the objective reasonableness of those reasons.…" (*Miles*, *supra*, 9 Cal.5th at p. 539.) Defendant may have drawn a different inference from A.M.'s youth and lack of life experience than the prosecutor did. But that fact is irrelevant. What matters is whether the prosecutor's reason was genuine. There is nothing inherently implausible in the prosecutor's stated reason, and no compelling reason to doubt its genuineness.

Defendant compares A.M. to another prospective juror – M.W. – as to "so-called life experience." Defendant notes that M.W. also had little life experience, yet the prosecutor declined an opportunity to strike him.

As the parties acknowledge, jurors cannot be compared on a single dimension such as life experience. "Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by *other* answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable." (*People v. Lenix* (2008) 44 Cal.4th 602, 624.) Because of these realities and the complexities of human nature, it is improper to focus on a comparison of isolated factors. (*Ibid.*) Defendant acknowledges that while the two might both lack extensive life experience, there *is* an important distinction between A.M. and M.W. as to a different factor: both of M.W.'s parents previously worked in law enforcement. In contrast, A.M. did not identify any family members when asked if he knew anyone in law enforcement. It remains entirely plausible the prosecutor declined to strike M.W. because considerations like M.W.'s parents' prior profession outweighed the relative lack of life experience.[9] In contrast, the prosecutor concluded that the sum of considerations against A.M. rendered him sufficiently undesirable to the prosecution.

Defendant also contends that an additional reason offered by the prosecutor – that A.M. wore certain articles of clothing multiple days in a row – was "ridiculous" and implausible. We fail to see how. There is nothing implausible about a prosecutor concluding that wearing certain articles of clothing multiple days in a row displays a lack of responsibility or interest in presentability that would be undesirable in a prospective juror. Even if this reason were deemed trivial, it would suffice because it is neutral. (See

---

[9] Defendant emphasizes that M.W.'s parents worked in law enforcement *before* he was born. However, a prosecutor could have still preferred M.W. knowing he had been raised by people who had chosen law enforcement as a career at one point.

*People v. O'Malley* (2016) 62 Cal.4th 944, 975; but see Code Civ. Proc., § 231.7, subd. (e)(9) [new prospective rule].)

Defendant also contends the prosecutor "made it sound as if" A.M. was adamant about not wanting to be a peace officer; yet the record does not show A.M. was adamant about the issue. The record does not support defendant's claim that the prosecutor made it sound as if A.M. was adamant. Rather, the prosecutor correctly pointed out that while A.M. wanted to work at the Sheriff's Activities League, he did not want to be a peace officer. The prosecutor also said A.M. "had no intention of being a peace officer," which is a wholly accurate description of the record.

First, we note that the prosecutor frequently accepted the panel while prospective jurors with Hispanic surnames were seated. While this fact " ' "does not necessarily settle all questions about how the prosecution used its peremptory challenges, these facts nonetheless help lessen the strength of any inference of discrimination …." ' " (*Holmes*, *supra*, 12 Cal.5th at pp. 762–763.) The prosecutor's acceptance of the panel at those junctures was an " ' "indication of the prosecutor's good faith in exercising his peremptories, and … an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection ." ' " (*Id.* at p. 763.)

### E.    *A.L.*

As to A.L., defendant points to the prosecutor's comment:

"[A.L.] was the preschool teacher. She had been doing that for ten years, *dealing with special needs*. The [*sic*] she had never been on a jury before. She gave a response of five as to wanting to be here or not. I haven't had much luck with teachers *in that area* in my previous trials. She also has – I think even though she wanted to be on the jury, she stated it was a five, but she wanted to see what it's like, her body language and with that background and schooling, it was concerning to me. And considering I have 30 preempts total, I figured why take a chance on somebody versus someone that I think would be better for me. So based on that, I dismissed her." (Italics added.)

In ruling on the *Batson*/*Wheeler* motion, the court stated

"As it relates to [A.L.], she was an individual that was spoke to involving her scheduling and so forth, and to the extent [the prosecutor] has indicated his reluctance to keep her on this panel, recognizing that she is a teacher, how she placed herself on a scale from 1 to 10, in addition to her body language, those, likewise, would fall under the category of jury characteristics and would, therefore, justify group neutral reasoning."

As defendant points out, the prosecutor was incorrect. A.L. said she was a preschool teacher and that her *significant other* was a "manager" who "works with people of special needs."

Initially, it is important to note that, as to A.L., the court did not make a " ' "global finding," ' " but instead discussed specific reasons offered by the prosecutor. (See *Miles*, *supra*, 9 Cal.5th at p. 539 [global findings insufficient where prosecutor' stated reasons are unsupported by the record].)

As the court's comments reflect, A.L.'s profession was only one of several justifications offered by the prosecutor. It is true that the prosecutor misstated the *type* of teacher A.L. was. However, the fact that a prosecutor has a mistaken recollection about a prospective juror does not necessarily establish discriminatory purpose. (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 979.) A genuine mistake, such as one arising from faulty memory, is a race-neutral reason for exercising a peremptory challenge. (*People v. Williams* (1997) 16 Cal.4th 153, 188–189.) Thus, even cases like *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1166–1167, draw the important distinction between an "isolated mistake or misstatement" versus a prosecutor's stated reason being completely unsupported by the record. Here, we are dealing with former, not the latter.

The prosecutor's mistake – while unfortunate – is also quite plausible from the record. A.L. mentioned she was a teacher in the same sentence as discussing "people of special needs." The prosecutor's mix up is understandable, given that he made the misstated recollection over 300 pages of transcript later. In the end, we are not dealing with a justification wholly unsupported and contradicted by the record, but rather a plausible mix up by the prosecutor.

Defendant says it was "specious" for the prosecutor to cite as a basis for the peremptory A.L.'s choice "five" on the one to 10 scale of interest in performing as a juror. Defendant notes that Juror No. 5209579 similarly said she was a "five-five" on the same scale yet was seated as a juror. However, "for a comparative analysis to be probative, a seated juror must have a ' "substantially similar *combination* of responses," in all material respects' to an excused juror." (*People v. Bryant* (2019) 40 Cal.App.5th 525, 540.) Defendant has not shown Juror No. 5209579 had a substantially similar combination of responses as A.L.

Defendant notes that the prosecutor did not use a peremptory challenge against a different juror, who was a non-Hispanic retired teacher (Juror No. 5097137). But aside from work experience as a teacher, defendant points to few similarities between the two. And the record discloses substantial differences between the two. Juror 5097137 had previously served on a jury that successfully reached a verdict; was apparently substantially older as evidenced by her five children aged from 32 to 40 years old, and wanted to serve on the jury "eight, nine" out of 10. In contrast, A.L. had never served on a jury, was young enough to have a child who needed to be walked to school while her oldest was still young enough to be going to "camp," and wanted to serve on the jury a five out of 10.

## F.  *C.C.*

Recall the prosecutor identified several bases for dismissing C.C., including "the field that she wants to go into," her physical demeanor, and lack of life experience. Defendant argues that C.C. "was not even a teacher, let alone a special education teacher." The import of this contention is unclear. Career *plans* are a race-neutral justification, just as a current profession would be.

Defendant says a global finding by the court and a failure to probe the prosecutor as to C.C. was improper because the prosecutor's reasons were unsupported by the record. But defendant fails to explain how the record contradicts the prosecutor's

reasons. Therefore, he has not established that the court was required to do more than it did with respect to C.C.

Defendant finds meaning in the fact that the prosecutor's first given reason for striking C.C. was that she was from Delano. The parties disagree as to whether Delano's relevance to the case is clear from the record. But that is not the inquiry. There is nothing in the record suggesting the prosecutor's concern with Delano was related to race. And defendant points to nothing in the prosecutor's stated reasons regarding C.C. that were contradicted by the record so as to require heightened inquiry by the court.

Because defendant has failed to establish that the prosecutor exercised a peremptory challenge on impermissible grounds, his *Batson*/*Wheeler* claim fails.

## II. Under Assembly Bill 333, Defendant's Conviction for Active Gang Participation, the Gang Enhancement and the Vicarious Firearm Enhancement Must be Reversed

Defendant contends that under Assembly Bill 333, his conviction for active gang participation, the gang enhancement, and the vicarious firearm enhancement must be reversed. Under Assembly Bill 333, "benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." (§ 186.22, subd. (g).) The Attorney General concedes the issue because a reasonable jury could conclude the "common benefit" of the murder in this case was not more than reputational, and we accept the concession. (See *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033.)

The prosecution may retry defendant on the reversed conviction and enhancements. (See *People v. Vasquez*, *supra*, 74 Cal.App.5th at p. 1033.)

## III. Sufficient Evidence Supported Special Circumstance Finding

### A. *Assembly Bill 333 and Its Impact on Section 190.2, Subdivision (a)(22)*

However, the gang-murder special-circumstance finding must be analyzed separately. While Assembly Bill 333's changes to section 186.22, subdivision (g) affect

27.

the gang participation count, the gang enhancement, and the firearm enhancements based on a finding under section 186.22, they do not apply to statutes in other chapters of the Penal Code, such as section 190.2. To the contrary, subdivision (g) expressly limits its definition of "benefit, promote, further, or assist" to the use of those terms in chapter 11 of title 7 of the Penal Code. (§ 186.22, subd. (g) ["As used in this chapter, to benefit, promote, further, or assist means…"].) Section 190.2 is in an entirely different title of the Penal Code, much less chapter. And we are aware of no statute that otherwise incorporates section 186.22, subdivision (g) into section 190.2.

In contrast, changes to subdivision (f) of section 186.22 *do* impact section 190.2, subdivision (a)(22) because the latter provision defines active participation by express reference to subdivision (f).

**B.** *Gang-Murder Special Circumstance*

The gang-murder special circumstance requires a sentence of death or life in prison without the possibility of parole for a defendant whom the jury finds has "intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) Because the murder must have been carried out *to* further the activities of the criminal street gang, the defendant must have specifically intended to further the activities of the criminal street gang. (*People v. Arce* (2020) 47 Cal.App.5th 700, 714 (*Arce*).)

Section 190.2, subdivision (c) also provides for death or life without parole sentences for defendants who were not "the actual killer" but "who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests or assists, any actor in the commission of" a first degree murder for which another subdivision (a) special

28.

circumstance (e.g., gang-related murder under subdivision (a)(22)) was found true.[10] (§ 190.2, subd. (c).)

Defendant argues there was insufficient evidence that he specifically intended to further the activities of the criminal street gang. On substantial evidence review, we do not ask whether *we* " 'believe[] that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Hatch* (2000) 22 Cal.4th 260, 272.)

Intent is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise. (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494–495.) Criminal intent "may be deduced from the circumstances of the crime." (*People v. Grider* (1935) 10 Cal.App.2d 287, 288; see § 29.2, subd. (a).)

Here, the evidence supported the following inferences concerning the circumstances of the crime. Defendant is a gang member. Gang members commit violent crimes like murder to enhance their reputation within the gang and the gang's reputation in the community. This reputation enhancement discourages people from "talk[ing]" to law enforcement, which allows the gang to continue committing crimes. Gang members commonly work together, with one acting as a driver and the other directly committing crimes. The gang to which defendant belongs commits homicides as one of its primary activities. Defendant got into an altercation with an individual, who then ran away. A fellow gang member (Nunez) joined defendant, and they both chased the victim down. Defendant's fellow gang member then shot and killed the victim.

---

[10] Section 190.2, subdivision (c) can also apply in cases of first degree murder where a different special circumstance other than subdivision (a)(22) is found true under section 190.4. (§ 190.2, subd. (c).)

From this evidence, a reasonable jury could infer that fellow gang members Rojas and Nunez jointly engaged in one of their gang's primary activities in order to enhance their gang's reputation for retaliatory violence. The fact that Nunez became involved at all – and was ultimately the actual killer – raises an inference that the murder was motivated by the need to uphold or enhance the gang's reputation for retaliatory violence rather than any personal disagreement between Rojas and Ellington.

Defendant observes that his case does not involve some of the evidence present in other cases where gang allegations were upheld. But the fact that a particular collection of evidence was sufficient in one case, does not mean that each constituent piece of evidence is necessary in every case. "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) That is especially true when making a negative argument for *reversal* by relying on cases that found their evidence *sufficient*.

In any event, even if it were undisputed that some facts in this case work in defendant's favor, that observation would not be dispositive on substantial evidence review. " ' " ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' "[11] (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278.)

## III. Supreme Court Precedent Holds that Assembly Bill 333 Did Not Impermissibly Amend Proposition 21

The Attorney General argues that Assembly Bill 333 unconstitutionally amended Proposition 21 (as approved by voters, Primary Elec. (Mar. 7, 2000)) (Proposition 21). In

---

[11] Defendant's remaining contentions, such as reversal being warranted because some of the gang-related circumstances found in other cases are not present here, is rejected for the same reason.

our original opinion we agreed with this contention because Assembly Bill 333 removed multiple categories of defendants from Proposition 21's coverage who would otherwise have fallen under its harsher sentences. This amendment, while otherwise perfectly permissible, failed to reach the vote threshold required by section 39 of Proposition 21 (i.e., a two-thirds majority in each house or voter approval). (Voter Information Guide, Primary Elec. (Mar. 7, 2000) text of Prop. 21, § 39, p. 131.)

The Supreme Court subsequently granted review and instead focused on whether Proposition 21 evinced an intent to make a time-specific incorporation of section 186.22, subdivision (f). (See *People v. Rojas* (2023) 15 Cal.5th 561, 571–575.) After concluding the voters did not so intend, the Supreme Court reversed and remanded this matter back to us, with directions to conduct further proceedings consistent with their opinion.

Based on the Supreme Court's decision in *Rojas*, we reject the Attorney General's contentions.

IV. **It Was Not Error to Omit from Jury Instructions a Requirement that Defendant Intended to Further Activities of Criminal Street Gang When Committing the Actus Reus of Sentence Enhancement Under Section 190.2, Subdivision (c)**

The court instructed the jury:

"The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang, in violation of Penal Code Section 190.2(a)(22).

"To prove that this special circumstance is true, the People must prove that:

"One, the defendant intentionally killed Brandon Ellington;

"Two, at the time of the killing, the defendant was an active participant in a criminal street gang;

"Three, the defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity;

31.

"And, four, the murder was carried out to further the activities of the criminal street gang."

The court also instructed the jury:

"If you decide that a defendant is guilty of first-degree murder, but was not the actual killer, then when you consider the special circumstance of committing murder while an active participant in a criminal street gang, you must also decide whether the defendant acted with the intent to kill. In order to prove this special circumstance for a defendant who was not the actual killer, but who is guilty of first-degree murder as an aider and abettor, the People must prove that the defendant acted with the intent to kill."

The court also instructed the jury:

"If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he or she acted with the intent to kill for the special circumstance of committing murder while an active participant in a criminal street gang to be true. If the People have not met this burden, you must find this special circumstance has not been proved true for that defendant."

Defendant contends the court's instructions were erroneous because they failed to require the jury find he specifically intended to further the activities of the criminal street gang. The parties claim that *Arce*, *supra*, 47 Cal.App.5th 700, requires that he harbor such an intent. We disagree.

The discussion of intent in *Arce*, *supra*, 47 Cal.App.5th 700, stands for the unremarkable proposition that section 190.2, subdivision (a)(22) requires that the defendant who " 'intentionally killed the victim,' " did so with the specific intent of furthering the activities of the criminal street gang. (*Arce*, p. 714.) This is made clear by the statutory text, which requires that the defendant intentionally kill the victim and that the murder was carried out *to* further the activities of the criminal street gang. (§ 190.2, subd. (a)(22).) In order for an act to be carried out "to" have some particular effect, the actor must have intended for the act to produce the effect.

Here, however, defendant was not the actual killer. Thus, his sentence enhancement arises under section 190.2, subdivision (c). And the intent required by that

32.

provision is the "intent to kill" – not the intent to further the activities of the criminal street gang.

It is true that for defendant's sentence to be enhanced under section 190.2, subdivision (c), the circumstances described in subdivision (a)(22) needed to be found true. But that provision requires that the actual killer (i.e., Nunez) intended to further the activities of the criminal street gang. But so long as *Nunez* intended to kill *and* to further the activities of the criminal street gang; and defendant intended to kill when he aided, abetted, counseled, commanded, induced, solicited, requested, or assisted Nunez, the intent requirements for enhancing defendant's sentence under subdivision (c) are satisfied. (See § 190.2, subd. (c).) There is no further statutory requirement that defendant also intend to further the activities of the criminal street gang.[12] The absence of an instruction requiring that defendant have intended to further the activities of the criminal street gang is not error.

## V.     Parole Revocation Fine

The court imposed a $300 parole revocation under section 1202.45. The parties agree this fine was improper because defendant was sentenced to life without the

---

[12] It is important to note that section 190.2, subdivision (c) does not cover aiding and abetting alone – it also applies to counseling, commanding, inducing, soliciting, requesting or assisting in first degree murder. Thus, doctrines applicable to aiding and abetting cannot be imported wholesale to the entirety of the conduct encompassed by subdivision (c).

The text of section 190.2, subdivision (c) is relatively clear. If defendant A intentionally killed a victim with the specific intent to further the activities of a criminal street gang, and defendant B "assisted" in the killing with the intent to kill, the statutory intent requirements are met. In that circumstance, subdivision (c) would still apply to defendant B if, for example, he knew defendant A intended to further the activities of a criminal street gang *but did not personally harbor such an intent himself*. So long as defendant B intended to kill the victim when he assisted in the killing, and defendant A's killing of the victim otherwise satisfied subdivision (a)(22), then defendant B would be subject to sentence enhancement under subdivision (c). The text of subdivision (c) requires nothing more.

possibility of parole on count 1.  However, we do not resolve this issue because defendant will be resentenced on remand.

## DISPOSITION

Defendant's conviction for active gang participation (§ 186.22, subd. (a)), the gang enhancement (*id*., subd. (b)(1) and the vicarious firearm enhancement (§ 12022.53, subds. (d) & (e)(1) are reversed.  The matter is remanded for a possible retrial.  In either event, defendant shall eventually be resentenced.

In all other respects, the judgment is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


DETJEN, J.


SNAUFFER, J.